599 A.2d 630

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Karl S. CHAMBERS, Appellant.**

Supreme Court of Pennsylvania.

Argued May 7, 1990.

Decided Nov. 4, 1991.

Reargument Denied Jan. 7, 1992.

Thomas L. Kearney, III, Asst. Defender, for appellant.
H. Stanley Rebert, Dist. Atty., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

Karl S. Chambers, Appellant, was convicted of murder of the first degree and robbery, and was sentenced to death. Pursuant to 42 Pa.C.S. § 9711(h)(1),[1] this direct appeal followed. Immediately following the jury's return of its guilty verdicts, the Honorable Joseph E. Erb; of the Court of Common Pleas of York County, commenced a sentencing hearing in which the same jury found one aggravating circumstance to be present, i.e., that the killing occurred during the commission of a robbery (42 Pa.C.S. § 9711(d)(6)). The jury also determined that one mitigating circumstance was present, i.e., that the Appellant had no significant history of prior criminal offenses. (42 Pa.C.S. § 9711(e)(1)) (R., pp. 1216–17). The jury found the aggra-

1. 42 Pa.C.S. § 9711(h)(1) provides:
 **Review of death sentence.**
 A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

vating circumstance to outweigh the mitigating circumstance and determined that the sentence of death should be imposed. * Post-trial motions were considered and denied and the sentences were imposed.[2]

In this direct appeal, Appellant, through his counsel, raises sixteen issues of error allegedly committed by the trial court and, through his pro se supplemental brief, presents issues alleging the ineffective assistance of his counsel at both the trial and in this appeal.[3]

First, the Appellant asserts that insufficient evidence exists to support his conviction of murder of the first degree.[4] The Appellant argues that the evidence, as presented by the Commonwealth, was not based on eyewitness testimony, and that, therefore, the circumstantial evidence does not support a guilty verdict.

■ Our test for determining the sufficiency of the evidence is, by viewing the evidence in the light most favorable to the verdict winner, to determine whether the jury reasonably could have concluded that all elements of the crime were established beyond a reasonable doubt. *Commonwealth v. Syre*, 507 Pa. 299, 489 A.2d 1340 (1985), *cert. denied*, 480 U.S. 935, 107 S.Ct. 1577, 94 L.Ed.2d 768 (1987).

■ Our review of the record reveals that the Commonwealth established the following facts. On Saturday, February 1, 1986, at or near 3:30 p.m., the victim, Anna Mae Morris, entered the C & M Variety store (hereinafter the "Fish Store") to purchase groceries with proceeds from her Social Security check which she had cashed the preceding day. The clerk filled her order and tallied her purchases. The victim then reached under her shirt for her wallet,

---

**2.** Along with the death sentence, the court imposed a sentence of not less than ten years nor more than twenty years on the robbery conviction.

**3.** Appellant presents this supplemental brief pursuant to Pa.Rule of Appellate Procedure 3309(a), 42 Pa.C.S.

**4.** The Crimes Code defines murder of the first degree as:
A criminal homicide ... committed by an intentional killing. 18 Pa.C.S. § 2502(a), (d).

tendered the amount due, put the change in her wallet, replaced her wallet under her shirt and left the store. At the same time, Appellant and a group of his friends were playing pinball and eating fish sandwiches in plain view of the victim. They had recently come from the home of Adam McKinney, a member of this group, where they had smoked some marijuana and drank some alcoholic beverages. These friends testified that Appellant neglected to place money into the common fund they collected for food purchases that day at the fish store and that moments after the victim departed, Appellant told his friends that he had something to do, adding he would meet them later in the evening at Adam McKinney's house. Appellant quickly left the fish store.

No one saw the Appellant, or the victim, until approximately 4:15 p.m. or 4:30 p.m. when Edgar Coder and Travis Wolfe stated that they saw the Appellant and the victim on the Silver Bridge (so named because of its color). They were the last people to see the victim alive.

These witnesses testified that, although they could not hear what the Appellant and the victim were saying to each other, they appeared to be arguing. In addition, Edgar Coder testified that the Appellant had what appeared to be a large stick in one of his hands. Sometime between 4:45 p.m. and 5:00 p.m., another witness, Kevin Hartmen, while walking his dog there, noticed a body under the Maryland–Pennsylvania Railroad Bridge (hereinafter the "Black Bridge" so named because of its painted color). (The Black Bridge is in close proximity to the Silver Bridge and both of these structures span the Codorus Creek.) Kevin Hartmen immediately contacted his friend, Donald Snell, who also saw the body. Mr. Snell approached his father about what he had seen. His father then told a retired policeman. In turn, the retired policeman contacted the York Police Department and reported the body beneath the Black Bridge.

The police arrived at the scene at 8:35 p.m. and began their investigation. The police found the victim's numerous articles of clothing, her torn open, empty wallet, along with

her upper and lower dentures strewn around her lifeless, nude body. The autopsy revealed the victim was beaten to death by a blunt instrument and the cause of death was later determined to be a subdural hemorrhage or brain hemorrhage (R., p. 590).

While the police were investigating the murder scene, Appellant, armed with an axe handle, went to a local bar called the Shady Dell. Before he was permitted to enter the bar, the manager, John Ettline, ordered Appellant to leave this club outside because Mr. Ettline did not want patrons carrying weapons into his establishment. Appellant complied and meandered through the Shady Dell for a time and left without re-claiming his stick. From there he proceeded to Adam McKinney's home. When he arrived at Adam's home, Appellant now possessed alcohol, marijuana, and money. Appellant did not tell his friends where he had been, what he had done, or where he obtained the money to make his purchases, whereas a few hours before he did not have funds to contribute to their kitty.

Over the next few months the police engaged in an exhaustive investigation. The questioning of witnesses revealed that the Appellant often carried an axe handle, that he told his friends the police considered him a prime suspect, and that the police stopped Appellant as he was attempting to leave town. Debra Phillips, a woman who knew the Appellant, told the police she gave the axe handle to him because of a foot injury he received in an altercation with Debra's nephew some time before the murder. At that time, she suspected he could use the handle as a cane. Intense questioning of the Appellant's acquaintances confirmed that on the day of the murder the Appellant was seen carrying this axe handle. Their testimony also revealed that when he entered the fish store on the day of the murder, he had the axe handle with him but the owners requested he leave it outside. When Appellant's friends left the fish store after the Appellant had departed, they noticed that the stick was gone. And finally, they noted

that the Appellant did not have "his stick" when he rejoined them later in the evening at Adam's house.

On December 9, 1986, while Appellant was in the York County Prison on charges unrelated to this incident, he confided in two fellow prisoners, Jeffrey Hutchenson and Richard Taylor, and told them that he had killed the victim. Appellant said, "that when he asked the victim for her money and she refused, he hit her and took the money." The next day Jeffrey Hutchenson contacted his attorney, who notified the police. An arrest warrant was then issued on December 12, 1986, for the Appellant.

Although there were no eyewitnesses to the robbery or the murder, we believe the Commonwealth produced sufficient evidence to establish that Appellant robbed and murdered Anna Morris. True, all of the evidence was circumstantial; however, circumstantial evidence is sufficient to sustain a conviction "so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Steele*, 522 Pa. 61, 559 A.2d 904, 909 (1989); *Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988). These witnesses were able not only to place the Appellant at or near the scene of the crime, they were also able to provide proof of a motive. Circumstantial evidence can be as reliable and persuasive as eyewitness testimony and may be of sufficient quantity and quality to establish guilt beyond a reasonable doubt. *Commonwealth v. Tedford*, 523 Pa. 305, 567 A.2d 610, 618 (1989). Therefore, we conclude that sufficient evidence exists in the record to support the conviction of murder of the first degree and robbery and we dismiss the Appellant's contrary contention. *Commonwealth v. Marshall*, 523 Pa. 556, 568 A.2d 590, 593 (1989).

## PRE-TRIAL ERRORS

Next, Appellant contends that the trial court committed an abuse of discretion when it granted the Commonwealth's motion to challenge for cause Juror $ 41, Kathy Bucking-

ton. The Appellant claims the court improperly dismissed this venire person after she advised the court that she could follow instructions regarding the imposition of the death penalty.

■ The determination to disqualify a prospective juror is made by the trial judge based on both the juror's answers as well as his or her demeanor, and this ruling will not be reversed absent palpable abuse of discretion. *Commonwealth v. Blystone,* 519 Pa. 450, 549 A.2d 81 (1988). Our reading of the record reveals that the following occurred during the voir dire proceedings.

■ The court released Mrs. Buckington because she would not follow the law in Pennsylvania regarding the standard of proof in a criminal prosecution. During her voir dire examination, Mrs. Buckington testified that she would hold the Commonwealth to a standard other than "beyond a reasonable doubt." In response to a question from the judge regarding her willingness to vote for a conviction, Mrs. Buckington responded, "I'd have to be definitely, absolutely satisfied. If I'd have a doubt then someone would have to prove to me to the nth degree." It was apparent to the trial court, as it is to us, that this venire person had her own standard of proof which is different from the one we announced in *Commonwealth v. Webb,* 449 Pa. 490, 296 A.2d 734, 737 (1972), and which merely reaffirmed the well established rule of law that one may not be convicted of murder unless the Commonwealth establishes every essential element of the crime beyond a reasonable doubt. *Id.* We conclude that the trial court acted properly when it sustained the prosecutor's challenge for cause in regards to Mrs. Buckington.

Appellant's second allegation of pre-trial error concerns the trial judge's refusal to grant his motion to continue the trial when he notified the court that the local press disseminated prejudicial pre-trial publicity. Appellant directed the court's attention to an article which appeared on the first morning of the trial in *The Daily Record,* a publication of

wide circulation in York County. Immediately thereafter, he objected to the start of the trial because of this prejudicial publicity.

 When an accused claims to have been prejudiced by an inordinate dissemination of pre-trial publicity pertaining to the crime charged, the accepted procedure is to request a change of venue or, in the alternative, a continuance. *Commonwealth v. Douglas*, 461 Pa. 749, 337 A.2d 860 (1975). Normally, one who claims he has been denied a fair trial because of prejudicial pre-trial publicity must show actual prejudice in the impaneling of the jury. *Commonwealth v. Romeri*, 504 Pa. 124. 131–32, 470 A.2d 498, 501–02 (1983), *cert. denied*, 466 U.S. 942, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984).

 Pre-trial prejudice is assumed if: 1) the publicity is sensational, inflammatory, and slanted towards conviction rather than factual and objective; 2) the publicity reveals the accused's prior criminal record, if any, or if it refers to confessions, admissions, or reenactments of the crime by the accused; and 3) the publicity is derived from police and prosecuting officer reports. *Commonwealth v. Pursell*, 508 Pa. 212, 221, 495 A.2d 183, 187 (1985). If prejudicial publicity occurs, the trial court may exercise its discretion and may continue the case, change the venue, resort to extensive voir dire to assure the attitudes of jurors have not been influenced by disclosure, or use the costly and inconvenient device of jury sequestration. *Philadelphia Newspapers, Inc. v. Jerome*, 478 Pa. 484, 498, 387 A.2d 425, 432 (1978).

 Here, the trial court diligently that noted this publication listed information pertaining to this case and other cases slated for trial during the court's term. Specifically, the article detailed the following information about the Appellant: his name, his age, the nature of his case, and the dates of the alleged occurrence. Also, the article made a reference to the victim's "nude and battered body," a statement the court felt could heighten the interest of the

individuals reading it. Nevertheless, the court noted that it felt the journalistic report did not go beyond anything which would be introduced at trial, and the Appellant had not suffered any prejudice due to the publication of this pre-trial article (R., p. 4).

Since the voir dire examination is the proper place to determine whether a defendant's public notoriety has resulted in a prospective juror's prejudice, an extensive voir dire was conducted. The trial court permitted Appellant's counsel to ask any prospective juror, "whether they read the paper, and if they had, whether they would be influenced by what the paper said." (R., p. 4). Additionally, the judge assured counsel that "[i]f they could not set aside information given in the paper, we will consider whether they should be excused as jurors." (R., p. 4). Thereafter, the jurors were advised not to read any newspaper articles regarding the case or to watch television coverage of the event. Moreover, the Appellant neither moved for a change of venue, nor did he request a sequestration of the jurors. Based on our review of the record, we can perceive no abuse of discretion or error of law in denying the Appellant's motion for continuance where no actual prejudice was demonstrated and dismiss the Appellant's contrary allegation.

## GUILT PHASE ALLEGATIONS OF ERROR

Appellant alleges that the trial court committed an abuse of discretion when it refused to grant his motion for a mistrial after the Commonwealth produced a statement taken from the Appellant which was not supplied to his defense counsel during pre-trial discovery. This statement is best described as handwritten notes inscribed by Detective Smith, a York police officer, of statements made by the Appellant in an interview which occurred two days after the homicide. Detective Smith did not incorporate the notes into his police report because he thought he had lost the notes through his own inadvertence. After the trial commenced, however, Detective Smith re-discovered the notes

and promptly presented them to the prosecutor who delivered a copy to the Appellant's counsel. The Appellant asserts, in his brief, that the Commonwealth's failure to provide this statement until after the trial began is a denial of his right to due process as announced in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant claims that the Commonwealth's failure to produce this note upon demand pursuant to Pennsylvania Rule of Criminal Procedure 305 also constitutes a violation of Rule 305(B), thereby "thwarting defense counsel's pre-trial discovery." Technically, Appellant believes he should have been "granted a continuance to thoroughly investigate the newly discovered evidence and was unduly disadvantaged by this 'surprise.'"

The trial judge conducted an *in-camera* examination of the note which revealed that it was neither an incriminating statement nor an admission against Appellant's interest. The content of the note revealed that the Appellant may have engaged in illicit conduct with a person by the name of "Smitty" at some point in the evening following the murder. A thorough investigation conducted by the detective produced neither an individual by the name of Smitty, nor information as to the whereabouts of a person by the name of Smitty.

■ Where the evidence is material either as to guilt or as to punishment, irrespective of the good or bad faith of the prosecution, suppression of evidence favorable to the accused violates due process. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. Mr. Justice Nix, (now Chief Justice Nix) speaking for the court in *Commonwealth v. Murphy*, 493 Pa. 35, 425 A.2d 352 (1981), explained:

It is to be noted that the Brady rule was not intended as a rule of discovery in criminal cases. There is no general constitutional right to discovery in a criminal case, and Brady did not create one; ... "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded...." *Wardius v. Oregon*, 412 U.S. 470, 474, 93 S.Ct. 2208, 2211, 37 L.Ed.2d 82

(1973); *Weatherford v. Bursey*, 429 U.S. 545, 549, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977).

*Murphy*, 493 Pa. at 45, 425 A.2d at 357. In *Brady*, the defendant did not discover the non-disclosed evidence until after his trial, conviction, and sentencing. Thus, Brady complained he was denied his rights under due process of law because the jury did not have the benefit of the evidence when they assessed his guilt and determined his penalty. This is not the situation here, where the infirmity alleged is that the prosecutor failed to disclose the evidence prior to the trial. Therefore, *Brady* is inapplicable.

▮▮▮ Also, a request for a mistrial is out of proportion to the discovery violation alleged. A mistrial is required only when an incident is of such a nature that its unavoidable effect is to deprive appellant of a fair trial. *Commonwealth v. Crawley*, 514 Pa. 539, 554, 526 A.2d 334, 342 (1987), citing *Commonwealth v. Hernandez*, 498 Pa. 405, 415, 446 A.2d 1268, 1273 (1982). Our Pennsylvania Rule of Criminal Procedure 305(E),[5] provides:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such order as it deems just under the circumstances.

5. Rule 305(B)(1)(b) states:
 (1) Mandatory: In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
 (b) any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made, which is in the possession or control of the attorney for the Commonwealth; ...
 Pa.Crim.P., Rule 305, 42 Pa.C.S.

It is important to note that the district attorney did not cause the Appellant to be denied this information; rather, it was through the inadvertence of the investigating officer, Detective Smith, who misplaced his notes. Second, the district attorney immediately gave the notes to Appellant's counsel as soon as he came into possession of them on the first day of the trial. Defense counsel was given the opportunity to view the evidence and to discuss the notes with the Appellant, who informed his counsel that it would be impossible to locate the person referred to as "Smitty." (R., p. 561). Defense counsel relayed this information to the court and further stated that he would not be able to locate "Smitty" should the court grant him a continuance. (R., p. 562). And third, Appellant's counsel did not ask for a continuance after the trial judge held an *in camera* review of the testimony of Detective Smith regarding his investigation of this matter. In disposing of Appellant's motion, the court noted on the record:

> We recognize that this statement through inadvertence was not given to counsel for the Defendant. But there appears to be only one factor in the statement that cannot be verified at this time; and that deals with a person by the name of Smith who according to the statement would have seen the Defendant some substantial period after the event occurred. ... the individual ... is not an alibi witness, and in any event could be used perhaps to some limited extent to contest testimony of other witnesses. ... the only problem with this statement is giving the defense sufficient time to discuss it with his client, which we will do if he wishes. But we will not declare a mistrial, nor will we grant a mistrial, nor will we grant the motion to allow the Commonwealth to use the statement if there are conflicting—if there is conflictive [sic] testimony by the defendant from the stand as indicated. We will give the defense counsel sufficient opportunity to go over the statement with his client so that his client is familiar with it and counsel is familiar with it before calling the client to the stand. ...

(R., pp. 572–73). Since Appellant has not demonstrated how he was prejudiced by the failure to review these notes prior to trial, we find no abuse of discretion or error of law in the trial judge's refusal to grant a mistrial.

■ Appellant next argues that the trial court committed an abuse of discretion when it allowed the prosecutor to use the Appellant's statement, objected to in the argument above, in its case in chief. Specifically, Appellant argues that the nondisclosure of the police officer's report was deliberate on the part of the prosecution and amounts to "gross negligence", and in support of this argument, the Appellant cites the case of *Commonwealth v. Jenkins*, 476 Pa. 467, 383 A.2d 195 (1978).

Jenkins provided an oral statement to an investigating officer, who transcribed Jenkins' statement into his own notes, which he included with a written report. The trial judge ordered all such reports be made available to the defendant pursuant to the rules of criminal procedure then in effect. The assistant district attorney consistently denied their existence, and repeatedly assured the court, and the defense counsel, that no such statements existed despite their presence in the prosecutor's files. After the defendant placed his credibility at issue by taking the stand in his own behalf, the report was produced. The court permitted the prosecutor, over the objection of defense counsel, to use this report of Jenkins' oral statement. Afterward, it was determined that the report had been part of the Commonwealth's files from the outset of the investigation and had, at one point, been read by the assistant district attorney. Consequently, the trial court held, "since the misconduct went solely to the issue of defendant's credibility," the prejudicial impact of the prosecution's "deliberate or grossly negligent failure ... to produce the report" was minimal and did not require a new trial. *Supra*, 476 Pa. at 470, 383 A.2d at 196. We did not agree. On review, we held that Jenkins was entitled to a new trial because the non-disclosure affected the fairness of his trial.

Appellant's reliance on *Jenkins* is misplaced. The mere allegation of "gross negligence" on the part of the prosecutor is not enough to come within the ambit of *Jenkins.* Appellant has not established that the prosecution committed any misdeeds or that its actions resulted in giving him an unfair trial. Upon review we fail to discern any similarities between the fact patterns occurring in this case and those which occurred in *Jenkins.*

As already noted, the trial court recognized that this statement, through inadvertence, was not given to counsel for the Appellant. By contrast, the prosecutor in *Jenkins* not only withheld the statement from the defense, he denied he had it in his possession. Here, the trial judge permitted defense counsel to view the statement, discuss its contents with Appellant, and to question the detective at length, *in camera,* regarding his subsequent investigations and findings. Additionally, the trial judge ruled that he would not allow the Commonwealth to use the statement if "there is conflict[ing] testimony by the defendant from the stand." Under these circumstances, we affirm the trial court's action in permitting the prosecution to refer to the officer's notes.

Appellant's next contention is another allegation accusing the prosecutor of withholding evidence. Appellant postulates that the trial court erred because it would not grant a mistrial when the prosecutor used a prior inconsistent statement which was not supplied to the Appellant pursuant to his discovery request, to impeach defense witness Howard Chapmen. Appellant argues that this conduct was also violative of Pa.R.Crim.P. 305.

The notes in question were transcribed by Detective Provenza of the York police department, during an interview with Mr. Chapman, and were not included in his investigation notes with the police report. Detective Provenza withheld his notes from the assistant district attorney until after defense counsel concluded his direct examination. The prosecutor then attempted to cross examine the witness

concerning statements he testified to during the trial and those he gave previously to the detective.

Appellant's claim fails because the testimony of this defense witness is not subject to pre-trial discovery under Rule 305.[6] Howard Chapman is neither a prosecution witness, a co-defendant, co-conspirator nor an accomplice. He is a defense witness whose testimony did not affect the guilt or innocence of Appellant and, therefore, could not be prejudicial to him.

Appellant next claims that the trial court committed an abuse of discretion when it permitted the pathologist, Doctor Silverman, to testify regarding the victim's blood type. Appellant contends that the pathologist did not authenticate the blood sample nor did the Commonwealth properly establish the custodial chain from the doctor's withdrawal of the blood sample to the laboratory's testing of the evidence in question.

■■■ Generally, an expert may not state a conclusion which is based on evidence not in the record. *Commonwealth v. Thomas*, 444 Pa. 436, 282 A.2d 693 (1971). Nonetheless, this Court has determined that a medical expert is permitted to express opinion testimony on medical matters based, in part, on reports of others which are not in evidence, but which the medical expert customarily relies upon in the practice of his profession. *Commonwealth v. Smith*, 480 Pa. 524, 532, 391 A.2d 1009, 1013 (1978); *Thomas*, 444 Pa. at 445, 282 A.2d at 698.

6. Rule 305(B)(2)(b) states:
 (2) Discretionary with the Court: In all court cases ... if the defendant files a motion for pretrial discovery, the court may order the Commonwealth to allow the defendant's attorney to inspect and copy or photograph any of the following requested items, upon a showing they are material to the preparation of the defense, and that the request is reasonable;
 (b) all written or recorded statements, and substantially verbatim oral statements, of eyewitnesses the Commonwealth intends to call at trial;
 (c) all written or recorded statements, ... verbatim oral statements, made by co-defendants, ... co-conspirators or accomplices ...

■ A review of this record reveals that the Appellant stipulated to Doctor Silverman's qualifications as a pathologist and to the nature of a pathologist's expertise, i.e., that a pathologist examines laboratory specimens, tissues, fluids, and upon occasions performs autopsies (R., p. 584). Doctor Silverman performed the autopsy on this victim at the York Hospital on February 2, 1986 and prepared his report on February 3, 1986. Pursuant to his normal autopsy examination procedure, the doctor withdrew blood from the cadaver and transported it to the blood bank for analysis (R., p. 614). Although this blood analysis report was not introduced into evidence, the doctor used the information in his own report to surmise the blood type of the victim. When queried as to victim's blood type, Doctor Silverman testified that it was O positive.

Since the witness normally relied upon reports such as these, the trial court did not abuse its discretion when it ruled that the witness could testify as to the findings in the lab report concerning the victim's blood type, which in any event, did not link Appellant to the crime.

■ Appellant next argues that the trial court should have granted a mistrial because the medical testimony did not establish that the victim received "tens of blows" as the prosecutor described in his opening statement to the jury. Appellant maintains that the district attorney intentionally misstated the evidence to mislead and to inflame the jury so that they would return with a finding of guilt.

Our examination of the record discloses that the district attorney did not make this comment during his opening statement; instead, he made it during the individual voir dire of a prospective juror, Josephine J. Huber, who was not selected as a juror or as an alternate on Appellant's panel. (R., p. 168). Any prejudice, therefore, was cured when the venire person was not seated on the jury and Appellant's contrary contentions are rejected.

Appellant also claims that the trial court committed an abuse of discretion because it refused to grant his motion

for a mistrial when he objected to both the leading questions that the prosecutor asked Edgar Coder during his direct examination and to the district attorney's explanation "that he was leading the witness so that no prejudicial testimony would come out before the jury."

The record reveals that the court permitted the prosecutor to ask leading questions on direct-examination because the witness was fourteen years of age. A discussion, held at sidebar, revealed that this witness alleged that the Appellant, and another person not involved with the present incident, had robbed him. The district attorney was attempting to exercise caution so that this witness would not make a reference to the Appellant's involvement in another robbery. On the other hand, defense counsel requested the court to compel the district attorney to give cautionary instructions to the witness (R., p. 729). The trial judge took these requests into consideration and determined that he would allow the district attorney to lead the witness because of his age and because he felt this course of action would not harm the Appellant and would prevent any future problems the court could encounter if the witness unintentionally made a statement regarding the Appellant and his alleged robbery of this witness (R., p. 729).

A leading question is one which puts the desired answer in the mouth of the witness. *Commonwealth v. Dreibelbis*, 493 Pa. 466, 476, 426 A.2d 1111, 1116 (1981); *Kelly's Estate*, 399 Pa. 153, 159 A.2d 739 (1960). In *Commonwealth v. Deitrick*, 221 Pa. 7, 70 A. 275 (1908), we held:

> The rule that a party calling a witness is not permitted to ask leading questions ... is [to be] liberally construed in modern practice, with a large measure of discretion in the court to permit parties to elicit any material truth without regard to the technical considerations of who called the witness. It is a discretion not susceptible of exactly defined limits before hand, but to be exercised in the interests of justice and a fair trial under the circumstances as they arise.

*Deitrick; Commonwealth v. Reeves,* 267 Pa. 361, 110 A. 158 (1920). Considering the age of the witness and the Appellant's alleged involvement in another robbery, we see no abuse of discretion in allowing the district attorney to lead this witness through direct examination.

In regards to the district attorney's remark, "Well, I don't want to get any prejudicial information into the record, Your Honor . . . ," defense counsel argued this statement implied there was prejudicial information, and the court should have granted his motion for a mistrial (R., p. 727). The trial judge discussed this matter with the attorneys at side bar, and he denied the motion for a mistrial because he believed the jury had no idea as to what "prejudice" the district attorney was referring (R., p. 729). When defense counsel made this motion, the prosecutor was eliciting information from the witness regarding a run-in he had with Vince Raineri (R., p. 726). The court argued that if it were to poll the jury as to what they thought the prosecutor had meant by "prejudicial" the jury would not know. The parties were instructed to proceed. We find no error with the trial court action.

Appellant next claims that the trial judge erred when he permitted the district attorney to call additional witnesses not contained in the Bill of Particulars. Appellant claims that the Commonwealth's "failure" deprived him of the opportunity to conduct a thorough investigation of those witnesses, to explore any weaknesses in their testimony, and to counteract any unfair surprise.

A bill of particulars is intended to give notice to the accused of the offenses charged in the indictment so that he may prepare a defense, avoid a surprise, or intelligently raise pleas of double jeopardy and the statute of limitations. *Commonwealth v. Simione,* 447 Pa. 473, 291 A.2d 764 (1972); *Dreibelbis,* 493 Pa. at 472, 426 A.2d at 1114. It is not a substitute for discovery and the Commonwealth's evidence is not a proper subject to which a bill of particulars may be directed. *Commonwealth v. Davis,* 470 Pa. 193,

368 A.2d 260 (1977); *Dreibelbis,* 493 Pa. at 472–73, 426 A.2d at 1114. We agree with the trial court that Appellant attempted to disguise his discovery requests as a bill of particulars, and, conclude that the trial court properly rejected Appellant's attempt to stop these witnesses from offering their corroborative testimony.

## PENALTY PHASE

■ Appellant next claims that the court abused its discretion when it permitted the jury to consider the death sentence after the prosecutor conveyed his personal opinions concerning the death penalty. Second, the Appellant claims that the court erred when it permitted the jury to consider the death penalty after the prosecutor concluded his argument by quoting a passage contained in the Bible.

The first instance of alleged error occurred when the prosecutor argued to the jury:

> I submit, ladies and gentlemen ... If the death penalty is a deterrent, *and I believe it is;* and if the death penalty serves the societal needs for retribution, *and I believe that it does;* and if the death penalty serves the cathartic needs of the survivors of the victim, *and I believe it does*—(Emphasis added).

(R., p. 1198–99).

■ The terms of our death penalty statute permit a prosecutor to argue in favor of the death penalty. 42 Pa.C.S. § 9711(a)(3); *Commonwealth v. Travaglia,* 502 Pa. 474, 503, 467 A.2d 288, 302 (1983), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984); *Commonwealth v. Sneed,* 514 Pa. 597, 613, 526 A.2d 749, 757 (1987). Therefore, we have concluded that the prosecutor must have reasonable latitude in arguing his position to the jury during the penalty phase of the trial. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 55, 454 A.2d 937, 958 (1983), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). There is nothing improper in the prosecutor arguing the appropriateness of the death penalty because that is the only issue before the jury at the penalty phase of the trial.

*Sneed, supra.* In the case at bar, the trial judge determined that the prosecutor's remarks were not prejudicial. He instructed the jury to disregard these statements and to consider them only as argument presented by counsel (R., p. 1201). Further, the judge reminded the jury of their duty under the law and that their determination of the facts, not the beliefs of counsel, governed the outcome of the case (R., p. 1201). These instructions put the prosecutor's comments into their proper context and dispel any argument of prosecutorial misconduct.

Appellant's next contention is that the trial judge erred when he permitted the jury to deliberate after specifically instructing the district attorney that he was not to argue the brutality of the beating as an aggravating factor, but the district attorney argued this fact anyway. Our review of the record reveals this argument is factually incorrect. The district attorney argued a sole aggravating factor. "Killing committed in the perpetration of a felony." (R., p. 1197).

 Appellant also contends that the trial court erred when it allowed the jury to consider the death penalty using the commission of a felony as the sole aggravating factor. Defense counsel argues this charge forms the basis of a second degree murder charge and cannot support the aggravating circumstance.

This argument is similar to the argument raised in *Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656 (1986), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987), which concerned the similarity between an aggravating circumstance and the definition of second degree murder. 18 Pa.C.S. § 2502(b) and (d). We held in *DeHart:*

> This argument ignores the qualitative distinction between first and second degree murder. The essential element which distinguishes first degree from the lesser grades of murder is specific intent to kill. *Commonwealth v. Moore*, 473 Pa. 169, 373 A.2d 1101 (1977) (citing cases). In contrast, the intent necessary to establish second degree murder is constructively inferred from the malice

incident to the perpetration of an underlying felony. *Commonwealth v. Tarver*, 493 Pa. 320, 426 A.2d 569 (1981). Moreover, the fact that a first degree murder was committed in perpetration of a felony has been determined by the legislature to be an aggravating factor to be considered in the sentencing process. Thus a first degree murder committed in perpetration of a felony is not only a murder of a higher degree, it is made further culpable by the commission of the accompanying felony.

*DeHart*, 512 Pa. at 261, 516 A.2d at 669, 70. Therefore, Appellant's motion was properly denied.

■■■ Appellant also alleges that the trial court committed an error of law when it refused to grant the Appellant a new trial based on alleged after-discovered evidence. A new trial is not warranted on the basis of after discovered evidence, unless: 1) it could not have been discovered until after the trial despite reasonable diligence; 2) it is not used for merely cumulative or impeachment purposes; and 3) it is of such a nature that it would compel a different outcome. *Commonwealth v. Hugney*, 491 Pa. 222, 420 A.2d 422 (1980); *Commonwealth v. Scott*, 503 Pa. 624, 628, 470 A.2d 91, 93 (1983).

■■■ After trial, one of the witnesses at the trial for the Appellant, one Aaron Heiner, stated that a Michael Boyard had told him that he, Michael Boyard, had killed the old lady. He forgot to mention it during the trial and while he was testifying on behalf of the Appellant. This information was discoverable prior to, or during the trial. Therefore, the testimony of this witness would fail under *Scott*. In regard to a post-trial statement of Robin Wright, this affidavit merely reveals that the same Michael Boyard asked the affiant where he could hide a stick he used to "beat somebody up with." The affiant does not identify the alleged victim, therefore, it is doubtful that this evidence would compel a different outcome. *Scott, id.* Accordingly, the trial court correctly denied Appellant's motion for a new

trial.[7]

■ Finally, Appellant argues that the prosecutor overstepped the permissible bounds of oratorical flair in his closing argument by referring to the Bible. The record

7. Appellant raises five issues in his *pro se* petition alleging ineffective assistance of his trial counsel and one issue of court error. In his allegation of court error, the Appellant claims the Commonwealth's witnesses, especially Jeffrey Hutcheson and Richard Taylor, who were career criminals, lacked credibility. Issues of credibility are properly left to the trier of fact for resolution, and the finder of fact is free to believe all, part, or none of the evidence. *Fahy*, 512 Pa. 298, 516 A.2d 689 (1986). Since we have concluded that the evidence is sufficient to support the verdicts, Appellant's credibility arguments have no merit.

Next, Appellant claims that his trial counsel was ineffective. Ineffectiveness claims are measured by two components: 1) counsel's performance is evaluated in light of its reasonableness if it is determined that the underlying claim is of arguable merit; and, 2) the defendant is required to show how the ineffectiveness prejudiced him. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).

First, Appellant claims that his defense counsel was ineffective in not investigating the witnesses, Aaron Heiner and Robin Wright, and their whereabouts, when the trial judge and the district attorney claimed they were missing. We have already addressed this after-discovered evidence claim and rejected it as meritless and must reject any ineffectiveness claim along these lines.

Next, Appellant accuses his defense counsel of not acting as a reasonable advocate on his behalf. He contends that his counsel did not file any constitutional challenges to the death penalty; that he failed to exercise Appellant's right under the *Witherspoon* doctrine (*Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)); and that counsel failed to establish an evidentiary record which could be used to demonstrate bias against the Appellant. First, in *Zettlemoyer*, this court has rejected claims that the death penalty is unconstitutional under both the state and federal Constitutions. *Zettlemoyer, id.* Second, this Appellant fails to set out with any degree of specificity the underlying facts for his *Witherspoon* violation. And finally, Appellant also fails to state specifically how he was prejudiced by his counsel's alleged failure to "establish an evidentiary record."

Appellant also claims that he was prejudiced when his trial counsel failed to object when the prosecutor introduced evidence of Appellant's prior convictions. There can be no merit to this argument since the prosecutor introduced this evidence only in response to Appellant's decision to testify in the hopes that he could persuade jury that he was not involved in any "significant prior criminal history."

Finally, Appellant claims that his defense counsel was ineffective because he failed to argue that Pennsylvania's death penalty statute creates a presumption favoring death. This argument was rejected in *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); *Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656, (1986).

shows that the prosecutor stated, "Karl Chambers has taken a life." (R., p. 1201). "As the Bible says, 'and the murderer shall be put to death.'" (R., p. 1201). Defense counsel objected. The trial court immediately noted this objection and gave a curative instruction to the jury.

The guidelines governing a review of a claim of allegedly improper and prejudicial remarks made by a prosecutor during a sentencing hearing are set forth in *Commonwealth v. Zettlemoyer*, 500 Pa. 16 at 53–54, 454 A.2d 937 at 956–57, wherein we explained:

> The primary guideline in assessing a claim of error of this nature is to determine whether the unavoidable effect of the contested comments was to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict. *Commonwealth v. McNeal*, 456 Pa. 394, 319 A.2d 669 (1974); *Commonwealth v. Van Cliff*, 483 Pa. 576, 397 A.2d 1173 (1979). In making such a judgment, we must not lose sight of the fact that the trial is an adversary proceeding, Code of Professional Responsibility, Canon 7, E.C. 7–19—7–39, and the prosecution, like the defense, must be accorded reasonable latitude in fairly representing its version of the case to the jury. *Commonwealth v. Cronin*, 464 Pa. 138, 346 A.2d 59 (1975). Nevertheless, we do require that the contentions advance must be confined to the evidence and the legitimate inferences to be drawn therefrom. *Commonwealth v. Revty*, 448 Pa. 512, 295 A.2d 300 (1972). Deliberate attempts to destroy the objectivity and impartiality of the finder of fact so as to cause the verdict to be a product of the emotion rather than reflective judgment will not be tolerated. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978). The verdict must flow from the respective evidence presented and not represent a response to inflammatory pleas for either leniency or vengeance. *Commonwealth v. Starks*, 479 Pa. 51, 387 A.2d 829 (1978).

In the past we have narrowly tolerated references to the Bible and have characterized such references as on the limits of "oratorical flair" and have cautioned that such references are a dangerous practice which we strongly discourage. *Commonwealth v. Henry*, 524 Pa. 135, 569 A.2d 929 (1990); *Commonwealth v. Whitney*, 511 Pa. 232, 512 A.2d 1152 (1986). We now admonish all prosecutors that reliance in any manner upon the Bible or any other religious writing in support of the imposition of a penalty of death is reversible error per se and may subject violators to disciplinary action.

Here, the prosecutor argued, "As the Bible says, 'and the murderer shall be put to death.'" This reference is substantially different than the references tolerated in *Henry* and *Whitney* where the prosecutor allegorically likened the Defendant to the Prince of Darkness mentioned in the Bible to establish that he was an evil person.

More than allegorical reference, this argument by the prosecutor advocates to the jury that an independent source of law exists for the conclusion that the death penalty is the appropriate punishment for Appellant. By arguing that the Bible dogmatically commands that "the murderer shall be put to death," the prosecutor interjected religious law as an additional factor for the jury's consideration which neither flows from the evidence or any legitimate inference to be drawn therefrom. We believe that such an argument is a deliberate attempt to destroy the objectivity and impartiality of the jury which cannot be cured and which we will not countenance. Our courts are not ecclesiastical courts and, therefore, there is no reason to refer to religious rules or commandments to support the imposition of a death penalty.

Our Legislature has enacted a Death Penalty Statute which carefully categorizes all the factors that a jury should consider in determining whether the death penalty is an appropriate punishment and, if a penalty of death is meted out by a jury, it must be because the jury was satisfied that the substantive law of the Commonwealth

requires its imposition, not because of some other source of law.

Because the prosecutor's argument in favor of the death penalty reached outside of the evidence of the case and the law of this Commonwealth, we are not convinced that the penalty was not the product of passion, prejudice or an arbitrary factor and, therefore, pursuant to our Death Penalty Statute, we must vacate the sentence of death and remand this matter for a new sentencing hearing. 42 Pa.C.S. § 9711(h)(4).

Accordingly, the conviction of murder of the first degree and the conviction and sentence imposed for robbery are affirmed, the sentence of death is vacated and the matter is remanded to the Court of Common Pleas of York County for a new sentencing hearing.

NIX, C.J., concurs in the result.

McDERMOTT, J., files a concurring and dissenting opinion.

McDERMOTT, Justice, concurring and dissenting.

I join the majority's affirmance of the conviction, however, I must dissent from the overreaction of the majority to the prosecution's biblical reference. The standard in evaluating whether a prosecutor crossed the line in his closing argument is whether his comments would have "the effect of arousing the jury's emotion to such a degree that it becomes impossible for the jury to impose sentence based on consideration of the relevant evidence according to the standards of the statute." *Commonwealth v. Travaglia,* 502 Pa. 474, 502, 467 A.2d 288, 302 (1983). In this case the isolated comment of the prosecutor was the last sentence in a brief closing. This was not emotional oratory calling for divinely motivated retribution; rather it was a reference to one of the texts from which our social system has evolved. The majority opinion is an unmerited censure of citizens called to such vast responsibility. To believe them swayed from their solemn, sworn duty by a single reference to a

588

legal irrelevance is a presciosity that undermines the very essence of trial by jury.