## Commonwealth v. Wesley

C.P. of Centre County, no. CP-14-CR-1316-2001.

*Ray Gricar,* for Commonwealth.
*William I. Arbuckle III* and *Kelley S. Gillette-Walker,* for defendant.

GRINE, *J.,* May 4, 2005—Presently before this court is the petition of Larry G. Wesley (petitioner) for relief under the Post Conviction Relief Act (PCRA). Petitioner alleges his trial counsel was ineffective and the prosecutor engaged in prosecutorial misconduct. He seeks relief

from this court in two forms: a new trial, or, alternatively, the restoration of his direct appeal rights. A hearing was held on the matter on February 28, 2005, at which time this court heard the testimony of petitioner's trial counsel, R. Bruce Manchester, Esquire as well as the testimony of petitioner's mother and the petitioner himself. At the conclusion of the hearing, this court ordered counsel for both parties to submit suggested findings of fact, conclusions of law, and memorandums of law. Counsel for the Commonwealth and the petitioner submitted their suggested findings, conclusions and memorandums in a timely manner, and this court has reviewed the arguments contained in each, in coming to its decision on the matter. After reviewing the trial transcripts and the arguments submitted by counsel, this court finds that petitioner's trial counsel was ineffective and grants petitioner's request for a new trial.

## PRELIMINARY DISCUSSION

Petitioner was convicted following a jury trial of criminal trespass, rape, sexual assault, indecent exposure with an individual under the age of 16 years present, and indecent assault. These charges stemmed from an incident that occurred in the early morning hours of July 25, 2001. Though petitioner was also charged with burglary as a result of the incident, the jury found him not guilty of that charge.

Petitioner was working as a musician in the State College area performing at local nightclubs. He lived in a rented house with several students of the Pennsylvania State University, though he himself was not a student at the time of the incident. Through his work at clubs he

met Alicia Pituch and later her roommates Christiana Hollobaugh and Nikki Soltis (the complainants). The four soon became friends and as individuals in their late teens and early twenties so often do, they would get together and "party" into the wee hours of the morning after local bars had announced their "last calls" and closed their doors. Petitioner and complainant Hollobaugh became especially good friends due to their mutual interest in music.

Petitioner had, over the course of his musical career, succumbed to the darker side of music that included drugs and alcohol. By the time he reached the age of 20, hard liquor and drugs were no strangers to him, a fact that at some point became apparent to these three friends.

In the late night of July 24 or early morning hours of July 25, 2001, petitioner called complainant Hollobaugh to see if he could "come over and hang out." She told petitioner that he could not come over to hang out at that precise moment due to the lateness of the hour and the fact that they were all in bed. Petitioner, however, went over to the house anyway some time between 4 a.m. and 7:30 a.m.

According to the testimony of the complainants, petitioner went into the bedroom where complainant Hollobaugh was sleeping and laid down in bed with her. She testified at trial that she was laying on her left side curled up in the fetal position and was sleeping in a state of undress, on top of the covers. According to her testimony, she awoke when she felt the petitioner attempt to put his penis inside her vagina. She testified that she did not feel him touch her, or even knew he was lying next to her until the moment of penetration. She asked peti-

tioner what he was doing and pushed him away from her. Petitioner then left the room, and complainant Hollobaugh stayed in bed until her alarm went off later that morning.

According to the testimony of complainant Soltis, she awoke at approximately quarter after seven in the morning to find petitioner standing in the doorway to her room. He asked her if he could get into bed with her. Complainant Soltis moved to make room to accommodate petitioner as best she could given the fact that her niece was sleeping in the same bed on the other side of her. Upon getting into bed with her, petitioner began to grope her breasts. Complainant Soltis told him to stop. Petitioner then stopped groping her and began to masturbate. Complainant Soltis pointed out to petitioner that her niece was in the same bed, and that his behavior, given the situation, was most certainly inappropriate. She asked petitioner to leave, which he did, and she took no further action.

Later, during the day of July 25, 2001, both complainants Soltis and Hollobaugh went to the Women's Resource Center to report the incidents of the early morning hours. Petitioner was arrested at his apartment that afternoon by two detectives from the State College Police Department. Petitioner was interrogated by the police and ultimately gave a written statement later that evening. Following his giving a written statement, petitioner was arraigned before District Justice Daniel Hoffman and committed to the Centre County Prison in lieu of $50,000 bail.

Attorney R. Bruce Manchester (trial counsel) entered this case following a call from petitioner's family.

Petitioner's mother, Sylvia Wesley, testified at the PCRA hearing that they were not from the Centre County area and had no knowledge of local attorneys either by name or reputation. Attorney Manchester, she testified was the first attorney the family spoke with who would agree to take the case.

Upon posting bail on July 30, 2001, petitioner and his parents met with Attorney Brian Manchester (son and law partner of trial counsel) for approximately three hours and then with trial counsel for another three. The representation agreement between petitioner and counsel called for counsel to represent petitioner on the charges of burglary, criminal trespass, rape, sexual assault, indecent exposure and indecent assault. Following his conviction on five of the six charges, a direct appeal was filed in the case, to which this court issued an order pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) ordering trial counsel to file a concise statement of matters complained of on appeal. That statement ultimately was never filed, and this court was compelled to inform the Superior Court thus. The Superior Court in turn ruled any matter complained of on appeal had been waived. It is this court's understanding that trial counsel was paid separately for this appeal, and after having failed to perfect the appeal, counsel refused to return the money until threatened with suit by PCRA counsel. Counsel then only returned approximately $2,300 of the $3,500 paid-for appeal and then only in two installments.

## DISCUSSION

In asserting a claim for post-conviction relief for ineffectiveness of counsel, a petitioner must clear several

hurdles. Counsel are presumed effective, and a petitioner must establish otherwise. *Commonwealth v. Carter,* 855 A.2d 885 (Pa. Super. 2004). First, a petitioner must show his claim is of arguable merit. Next, a petitioner must show that the action or inaction on the part of counsel was "not grounded on any reasonable basis" to effectuate his interests. Third, a petitioner must show that, but for counsel's action or inaction, the outcome of the proceedings would have been different. In other words, a petitioner must prove he was prejudiced by counsel's action or inaction. *Commonwealth v. Saranchak,* 866 A.2d 292, 299 (Pa. 2005), citing *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987); *Commonwealth v. Travaglia,* 541 Pa. 108, 118, 661 A.2d 352, 356-57 (1995). Also, in the context of a PCRA, petitioner must "plead and prove that counsel's stewardship 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.' " *Commonwealth v. Correa,* 444 Pa. Super. 621, 625, 664 A.2d 607, 609 (1995), quoting *Commonwealth v. Granberry,* 434 Pa. Super. 524, 530, 644 A.2d 204, 207 (1994).

It is with rare exception that this court finds a petitioner's trial counsel ineffective in the context of a PCRA petition. This fact makes sense as competency of trial counsel is presumed, and is the general rule rather than the exception. This case, however, proves to be one of those few exceptions where petitioner's trial counsel was ineffective, and the only adequate remedy is to grant petitioner a new trial.

So many incidents that occurred before, during, and after trial that amounted to ineffective representation and arguably unethical behavior that it would likely be easier

on this court to point out instances where trial counsel was effective rather than examine the instances where trial counsel was ineffective. However, this court will follow convention and examine instances of counsel's ineffectiveness.

### Ineffective Representation of Trial Counsel

In his suggested findings of fact and conclusions of law, petitioner enumerates a plethora of incidents that tend to show the ineffectiveness of trial counsel. In reviewing these incidents, this court noted three themes and will address each of those themes separately.

### A. Lack of Communication

Pennsylvania Rule of Professional Conduct 1.4[1] requires a lawyer to keep a client informed about "the status of a matter and promptly comply with reasonable requests for information" and that a lawyer "shall explain a matter to the extent necessary to permit the client to make informed decisions regarding representation." The comment to the rule provides further guidance in that a lawyer should ensure a client has "sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued."

At the PCRA hearing, trial counsel testified that he put extensive time in meeting with petitioner and his family. However, he could not provide this court with an

---

1. As of January 1, 2005, the Pennsylvania Rules of Professional Conduct were changed, but as this trial occurred in 2002, any references by this court to the rules of professional conduct will be the rules that were effective until January 1, 2005.

exact figure of hours spent meeting with petitioner and his family or an exact number of meetings. He testified that since he had switched his billing practices to charging a flat fee for services, he quit taking "meticulous notes" with respect to time spent meeting with clients. He did recall meeting with them "fairly regularly" and explained to this court that since his first meeting with petitioner and his family, wherein the family brought him Pepsi, they developed the custom of drinking Pepsis and talking about the case at length. Trial counsel also indicated that petitioner would frequently meet and talk with his investigator.

Petitioner's recollection of his meetings with trial counsel as well as the recollection of petitioner's mother are somewhat different. Petitioner recalled meeting with Attorney Brian Manchester for approximately three hours after having posted bail before actually meeting with trial counsel for another three hours that same day. The next time petitioner met with counsel was prior to the preliminary hearing on August 1, 2001, for approximately one hour. Following the preliminary hearing, petitioner did not meet with counsel again until October 8, 2001 at the time of the first jury selection in the case, at which time counsel's only advice to petitioner was that they wanted young men on the jury and no one who would favor the district attorney. The next meeting occurred almost a month later on November 7, 2001, at which time petitioner went with counsel's investigator to Centre Community Hospital for DNA testing and then the two drove by the residence where the incident happened though they did not stop or attempt to enter the residence to investigate further. The trial was continued twice. In December 2001, petitioner and his father met with coun-

sel briefly before the second jury selection, and petitioner and both his parents met with him again prior to the third jury selection.

With the case set to go to trial in March 2002, the Commonwealth filed a motion in limine to preclude petitioner's expert witness, as to his state of intoxication. No response to the motion was ever filed by trial counsel, nor did he forward a copy of the motion to his client. Though the motion in limine was argued and decided in favor of the Commonwealth on March 12, 2002, counsel never notified petitioner of the hearing, and petitioner, consequently, did not attend the hearing.

In addition to these meetings at critical junctures in the criminal proceedings, petitioner's mother also testified that she attempted to reach counsel by phone several times in order to speak with him about the case. She testified that speaking with counsel on the phone was next to impossible. Before she could speak with him directly via telephone, she had to first schedule an appointment by phone. This initial phone call to schedule another phone call resulted in petitioner's mother making multiple phone calls prompting counsel's office to advise her that she was calling too much.

Additionally, lack of sufficient communication was made evident to this court in the fact that petitioner and his family had no idea what trial strategy counsel planned to use. Upon his suggestion, if not outright insistence, the family hired a toxicologist to make a report concerning petitioner's level of intoxication but never fully understood the purpose behind the toxicologist nor saw his report before trial. Trial counsel indicated at the PCRA hearing that the whole point of the toxicologist's exami-

nation and report was to mitigate petitioner's level of culpability and lend credence to a defense of mistake of fact. Despite the fact that petitioner's state of intoxication at the time of the incident was no defense to the rape and sexual assault charges, it was a mitigating factor to the charge of burglary. As counsel stated, one of their main reasons of going to trial was to fight the burglary charge, and the toxicologist report would assist them in fighting that charge.

According to petitioner, he believed that the whole reason for going to trial was due to the discovery of DNA evidence. As related *supra,* during one of the meetings with counsel and/or his investigator, petitioner voluntarily submitted to DNA testing. During the investigation and discovery phases of the case, it was learned that a semen stain had been found on a comforter belonging to one of the complainants. The DNA test performed ruled out petitioner as the source of the stain. As a result of the DNA test, petitioner's mother testified that counsel called her and told her the news. In response to her asking what this meant for her son's case, she testified counsel responded to her question by posing the question: "How could he go to jail if the semen stain was not his?"

It was not until trial that petitioner and his family learned that the forensic evidence proving the semen stain did not contain petitioner's DNA would not be presented. As explained by trial counsel at the PCRA hearing, the Rape Shield Law prevented evidence of the complainant's prior sexual history from being presented. Instead of filing a rape shield motion, counsel agreed to a stipulation that there was no physical evidence linking the petitioner to the scene, yet none of this was explained to

petitioner prior to trial. This lack of communication prevented petitioner from fully understanding the state of his case, and, without that critical understanding, he could not adequately assist in his own defense or in making critical decisions with respect to the case.

## B. Lack of Adequate Preparation for Trial

At the PCRA hearing, trial counsel testified that he had 28 years of experience primarily in criminal defense work. In 2002, the year of petitioner's trial, counsel would have had 25 years of experience. There is no doubt in this court's mind that, in 25 years of practicing law, counsel has gained an extensive knowledge in the area of criminal law and trial preparation. This court also has no doubt that trial counsel would agree with the rule of $P^4$— "Proper planning prevents poor performance."

The final meeting with trial counsel occurred March 17, 2002, the day before trial, for approximately two hours in length. Petitioner and his mother testified that, at that meeting, counsel assigned them the task of reviewing the preliminary hearing transcript for any information that might prove useful at trial. Despite the fact that the trial was set to commence in less than 24 hours, petitioner was not prepped to testify during that meeting. Instead, counsel explained that, based on his years of experience, this trial would take the full two days allotted. Since petitioner was set to testify last, he was confident petitioner would not testify on the first day and stated they would prepare his testimony after the first day of trial. Though another meeting had been scheduled for the next day immediately before trial at counsel's office, counsel did not show up for that meeting, and

petitioner and his family instead met him at the courthouse.

While years of experience might have indicated to counsel that there was a good chance petitioner would not testify on the first day of trial, experience would have also indicated that the unexpected is always a possibility. On the afternoon of the first day of trial, the Commonwealth had rested with approximately 90 minutes remaining in the day. Trial counsel asked for a side-bar in which he asked this court when it planned on recessing for the day. Upon learning that this court planned on recessing at as good a stopping place as could be found around 5 p.m., counsel indicated he had two witnesses, including his client. His first witness was the petitioner's roommate, who would testify that petitioner was "a gentleman with an alcohol problem" and suggested that the conclusion of her testimony would be a good "breaking point" for the day. N.T. 03/18/2005 at 230 l. 25.

Counsel's explanation of his witness' testimony prompted the unexpected—the Commonwealth objected to the witness on the grounds her proposed testimony was not relevant, and this court agreed. The court stated it would permit counsel to call the witness as a character witness only, an offer he declined. With only petitioner left to testify, counsel asked for a recess, and this court denied the request. Rather than paraphrase the exchange of events, this court cites the transcript verbatim:

"Mr. Manchester: I think I asked for a recess.

"The Court: No, not now.

"Mr. Manchester: Then I need at least a half an hour with my client, because I really need to talk to him about some points and I—I don't know. I thought this would

go the full—I thought that my case would get going to-morrow. If I made a miscall, which obviously I did, it's my fault. I have him prepared to testify tomorrow morning . . . ." N.T. 03/18/2002 at 232 ll. 2-11.

Counsel insisted at the PCRA hearing that petitioner expected and prepared to testify, but, based on that exchange, it is obvious that counsel had not prepared his client to testify on the first day of trial, and 15 minutes of preparation is in no situation adequate to prepare a defendant to testify when on trial for rape, sexual assault, burglary, and a myriad of other offenses.

## C. Abandonment of Client

The final aspect of trial counsel's representation tending to establish his ineffectiveness can best be described as his outright abandonment of petitioner following his conviction.

It was evident from the PCRA hearing that neither petitioner nor his family were familiar with the criminal justice system prior to this incident and were relying on trial counsel to guide them through the process and see justice done. Counsel's representation fell far short of even the most basic expectations. Instead of providing petitioner with the information and advice necessary to make critical decisions regarding the case, counsel provided petitioner and his family with a rose-tinted view of the case to the disservice of his client. Following petitioner's conviction on the charges of rape, sexual assault, indecent exposure, criminal trespass, and indecent assault, counsel continued to give the family a false sense of hope. Counsel assured the family that, based on research he conducted, they had a "100 percent" chance

of success on appeal. A claim no experienced trial attorney should make. Furthermore, counsel did not prepare petitioner for the possibility he would go to jail following sentencing. Instead, he told petitioner and his family that he would likely remain out on bail pending appeal, nor did he prepare petitioner for the total amount of incarceration time he would receive. Petitioner had no idea of his actual sentence until he arrived at the Camp Hill diagnostic center and saw his status sheet.

Though a motion for reconsideration was filed in the case, no copy was ever provided to petitioner or his family. When a hearing was held on the motion for reconsideration, as with the pretrial conference and motion in limine hearing, counsel waived petitioner's appearance, effectively precluding petitioner from attending.

Quite possibly in response to counsel's assertion that an appeal would be successful in at least getting petitioner a new trial, an appeal was filed in the case. Regardless of the merits on the appeal, petitioner's direct appeal rights were deemed waived by the Superior Court when trial counsel failed to file a 1925(b) statement in response to this court's order. After, as this court understands, counsel was paid separately for this appeal.

It is obvious to this court that petitioner's claim of ineffective assistance has merit. Trial counsel essentially deprived petitioner of every means and opportunity to assist in his own defense, a series of actions for which this court can find no reasonable basis designed to effectuate petitioner's interest. Even if this court were to accept trial counsel's contention that this was a young man deep in the throws of addiction and depression, thus raising the implication that he could not adequately assist in

his own defense, counsel was still obligated to maintain as normal an attorney-client relationship as possible, which included providing his client with the critical information necessary to participate in his own defense. See Pennsylvania Rules of Professional Conduct Rule 1.14(a) ("When a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of minority, mental disease, or some other reason, the lawyer should, as far as reasonably possible, maintain a normal client-lawyer relationship with the client."). Counsel's failure to do so did nothing to serve his client's best interests and more than likely worked to petitioner's detriment. As such, this court is satisfied that petitioner has established that he was prejudiced by the actions of trial counsel and that no accurate determination of his guilt or innocence could be determined. Petitioner, therefore, must be granted a new trial.

### I. Prosecutorial misconduct

In addition to seeking PCRA relief on the grounds of ineffective assistance of counsel, petitioner also argues for relief on the grounds of prosecutorial misconduct. Specifically, petitioner claims that the district attorney made several statements during his closing arguments in which he injected his own personal opinion regarding petitioner's guilt, credibility, strategy or truth or falsity of any testimony or evidence, misstated evidence and/or mislead the jury as to the inferences it could draw from the evidence, used arguments designed to inflame the jury, injected issues broader than the guilt or innocence of the petitioner, and made predictions as to the consequences of the jury's verdict.

The role of the Commonwealth's prosecutor is dual. A prosecutor's job is not only to seek convictions but also justice. *Commonwealth v. Green,* 417 Pa. Super. 119, 124, 611 A.2d 1294, 1296 (1992) citing *Commonwealth v. Gilman,* 470 Pa. 179, 368 A.2d 253 (1977); *Commonwealth v. Collins,* 462 Pa. 495, 341 A.2d 492 (1975). A prosecutor crosses the line and engages in prosecutorial misconduct when the "unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Chmiel,* 777 A.2d 459, 466 (Pa. Super. 2001), citing *Commonwealth v. D'Amato,* 514 Pa. 471, 489, 526 A.2d 300, 309 (1987). (citations omitted) Yet it must also be recognized that a certain amount of latitude must be permitted in order to allow the Commonwealth to present arguments, as defense counsel is permitted, often referred to as "oratorical flair." *Id.* referencing *Commonwealth v. Chambers,* 528 Pa. 558, 599 A.2d 630 (1991).

This court has reviewed the statements made by the district attorney upon which petitioner's allegations of prosecutorial misconduct are based, and finds all the statements fell within the proper parameters of closing arguments save one that this court believes requires a greater analysis.

In arguing the district attorney made predictions as to the consequences of the jury's verdict, petitioner points to the following statement made by the district attorney during his closing argument:

"Does she have to tolerate this? Is this okay in Centre County? If you find this man not guilty of rape, sexual

assault and all of these crimes, that's what you're going to be saying. It's not only going to be contrary to the evidence because the evidence supports every one of these charges, every one of them, but unfortunately you would also be sending the wrong message. You'd be sending the message that a woman really isn't safe." N.T. 03/19/2002 at 75 ll. 10-19.

"Send a message" arguments fall within a gray zone that, depending on phrasing and context, can cross the line into the realm of prosecutorial misconduct, but in some instances they may be tolerable. For instance, in *Commonwealth v. DeHart,* 512 Pa. 235, 516 A.2d 656 (1986), the prosecutor's stressing the deterrent effect of the death penalty was not prosecutorial misconduct based on the Pennsylvania Supreme Court's decision in *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982) (Reference to the deterrent effect of the death penalty not prejudicial "because it was a matter of public knowledge based on ordinary human experience."). Likewise, in *Commonwealth v. Peterkin,* 538 Pa. 455, 649 A.2d 121 (1994), it was not prosecutorial misconduct for a prosecutor to urge the jury to send a direct message to the defendant. On the other hand, in *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190 (1997), the Pennsylvania Supreme Court reaffirmed its long-standing disapproval of "send a message" arguments in response to a prosecutor's argument to the jury that it send a message "that . . . you come out here from Philadelphia, . . . and shoot someone like the defendant did, . . . you are guilty of first-degree murder." 549 Pa. at 294, 701 A.2d at 202. Ultimately, however, the court concluded that the prosecutor's comments "did not warrant relief because they were based upon the evidence pre-

sented and did not ask the jury to send a message to the judicial system or to potential criminals." *Commonwealth v. DeJesus,* 860 A.2d 102, 117 (Pa. 2004).

This court is inclined to agree with the Supreme Court's sentiment that "send a message" arguments are such dangerous territory that only the bravest and most meticulous of prosecutors could safely tread through the land mine and ensure his/her comments not set off an explosion of misconduct. In the case at hand, the district attorney stated to the jury that, if it found the petitioner not guilty, it would be contrary to the evidence, and it would be sending a message to the women of Centre County that they were not safe. Based on the standard in *Hall,* as articulated in the *DeJesus* opinion, this statement made by the district attorney while treading on dangerous ground, did not constitute prosecutorial misconduct. His statement was based on the evidence, and the "message" was not directed to the judicial system or potential criminals. As such, this court finds no prosecutorial misconduct on the part of the district attorney.

The court enters the following order.

## ORDER

And now, May 4, 2005, after a hearing on the matter and a review of the suggested findings of facts, conclusions of law, and memorandums of law submitted by counsel for petitioner and the Commonwealth, it is hereby ordered and decreed that petitioner's trial counsel was ineffective.

Petitioner's request for a new trial is granted. Trial to be set for a term of court to be determined by the Criminal Court Administrator.