J-S52041-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TRISTIAN JONES | : | |
| | : | |
| Appellant | : | No. 1050 EDA 2019 |

Appeal from the Judgment of Sentence Entered March 5, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0002081-2018

BEFORE: PANELLA, P.J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED DECEMBER 22, 2020**

Appellant, Tristian Jones, appeals from the judgment of sentence entered in the Court of Common Pleas of Montgomery County following his conviction by a jury on the charges of first-degree murder, murder of an unborn child of the first-degree, and possession of an instrument of crime.[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows: On February 19, 2018, at approximately 3:20 a.m., in response to a 911 call, the police went to the apartment of Eboney White in Cheltenham Township, Pennsylvania. In the master bedroom, the police discovered the deceased

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 2604(a)(1), and 907(a), respectively.

victim, Eboney White, who was eight months pregnant with Appellant's child. Ms. White had suffered multiple stab wounds. Ms. White's daughters, A.G. and E.G., were in the apartment at the time of the murder.

Based on their investigation, including statements from twelve-year-old A.G., surveillance videos, and Appellant's cell phone records, the police determined that Appellant was the attacker. Accordingly, Appellant was arrested, appointed counsel, and proceeded to a jury trial.

At the conclusion of trial, the jury convicted Appellant of the offenses indicated *supra*. On March 5, 2019, the trial court sentenced Appellant to an aggregate of life in prison.

On March 15, 2019, Appellant filed a timely, counseled post-sentence motion, which the trial court denied on March 19, 2019. This timely, counseled appeal followed on April 10, 2019, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issues in his "Statement of the Questions Involved" (verbatim):

1. Did the trial court err in entering judgment against Appellant where the Commonwealth failed to present sufficient evidence to prove that Appellant was the person who committed these offenses?

2. Did the trial court err in denying Appellant's post-sentence motions where the verdict at trial was against the weight of the evidence?

3. Did the trial court err in admitting the out-of-court statements of A.G. where those statements were inadmissible hearsay?

Appellant's Brief at 7 (suggested answers omitted).[2]

Appellant contends the evidence was insufficient to sustain his convictions.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Brooks***, 7 A.3d 852, 856-57 (Pa.Super. 2010) (citations omitted).

Here, Appellant's sufficiency argument is specific in nature as he avers the evidence was insufficient to prove that he was, in fact, the person who committed the crimes. As such, we need not conduct a thorough review of the evidence to determine whether it can support a finding that all of the elements have been met. Rather, we will focus on the specific issue raised by

---

[2] We have renumbered Appellant's issues.

Appellant: whether the evidence was sufficient to establish that Appellant was the perpetrator of the crimes.

In addressing Appellant's sufficiency of the evidence claim, the trial court indicated the following in its Rule 1925(a) opinion:

Instantly, [Appellant] was engaged in an extra-marital affair with Eboney White which resulted in Ms. White becoming pregnant with a son. (N.T. Trial by Jury, 2/28/19, at 135). Ms. White was approximately thirty-four (34) weeks pregnant at the time of the murder. (N.T. Trial by Jury, 3/4/19, at 22). Ms. White knew [Appellant] had not told his wife or family about these developments and, during her conversation with [Appellant] over text messaging, Ms. White confronted [Appellant] over his refusal to inform his family. (**See generally** N.T. Trial by Jury, 2/26/19, at 84-159). On February 8, 2018, Ms. White texted [Appellant] an ultimatum which stated: "Anyway, I'm not looking for your empathy. That just isn't going to happen. I do want to let you know that I am no longer going to be complicit in this secret you are keeping from your family. So you have until the end of next week for them to hear from you or they will hear it from me, and if you don't speak to me anymore because of it, I don't care." (**Id.** at 107)[.] Ms. White later texted: "Clearly you care only about your own selfish games, so I'm going to put my son first, and I will make sure both of our families are aware of his impending arrival." (**Id.** at 108). Ms. White also informed her mother, Ernestine Scott, on February 15, 2018, that she suspected [Appellant] was being deceitful about the baby and was not fully committed to the pregnancy. (N.T. Trial by Jury, 2/22/19, at 226-28).

The arguments between Ms. White and [Appellant] continued until February 16, 2018, at which time [Appellant] inform[ed] Ms. White via text message that he informed his wife and children about their relationship and the pregnancy. (N.T. Trial by Jury, 2/26/19, at 138, 144). [Appellant] even described the reactions of his wife and children to Ms. White. (**Id.** at 138, 144-45). [Appellant] also claimed that as part of this conversation, he told his children that sex out of wedlock is a sin. (**Id.** at 149-50).

On February 18, 2018, [Appellant] and Ms. White texted each other to set up a lunch meeting for the next day in which

their families would meet. (**Id.** at 155). Around midnight on February 19, 2018, Ms. White asked if the lunch/brunch could take place at 11:00 a.m., but [Appellant] said he would rather the meeting take place at 1:00 p.m. (**Id.** at 156).

Jennifer Jones, [Appellant's] wife, testified that she had no knowledge of [Appellant's] affair with Ms. White or the fact that he had impregnated Ms. White. (N.T. Trial by Jury, 2/27/19, [at] 52-55). [Appellant] and Ms. Jones were previously living in separate residences due to another extra-marital affair [Appellant] had engaged in, but [Appellant] had moved back in and was living in Ms. Jones' apartment at [***] Johnson Street in Philadelphia, PA, in February 2018. (**Id.** at 49-52). Ms. Jones also testified that [Appellant] had never told their children about his relationship with Ms. White or her pregnancy. (**Id.**). Ms. Jones further testified that [Appellant] had never told her about any upcoming meeting with Ms. White in which they would figure out how to make it work with the new child. (**Id.**). [Appellant's] father, Mason Russell Jones, also testified that [Appellant] had never told him that he was having an extra-marital affair or that Ms. White was pregnant with his child. When [Appellant] spoke with his father following the murder[,] he claimed that the baby was not his. (**Id.** at 28-29).

On February 17, 2018, [Appellant] met with his close friend, Aaron Mitchum, at a bar. (**Id.** at 116-17). Mr. Mitchum testified that [Appellant] indicated he was unhappy about Ms. White's pregnancy and that [Appellant] said he did not have a plan for when the baby was born. (**Id.** at 119).

Ms. Jones informed authorities that she last saw [Appellant] on February 18, 2018[,] at 4:30 p.m. when she went to dinner with [Appellant's] parents. (N.T. Trial by Jury, 2/27/19, at 60-Commonwealth Exhibit 315). [Appellant] did not attend the dinner and Ms. Jones stated that [Appellant] informed her that he was going to work that night to clean buildings with a friend named Pat Wilkerson. (**Id.** at 56-57). An examination by authorities revealed [Appellant] had not worked for Pat Wilkerson since 2017 and there were no records of [Appellant] being employed anywhere since September 2017. (N.T. Trial by Jury, 3/4/19, at 91). The parties also stipulated that, if Pat Wilkerson were called to testify, he would confirm the last time [Appellant] did any work for Mr. Wilkerson was [in] June 2017 and [Appellant] was not working for Mr. Wilkerson at any time from February 18-19, 2018. (N.T. Trial by Jury, 2/27/19, at 114). [Appellant] did not have the keys to Ms. Jones' apartment, but could access

- 5 -

interior parts of the apartment building. (*Id.* at 58-59). Ms. Jones indicated she next saw [Appellant] at approximately 5:30 a.m. on February 19, 2018, when she let him into her apartment after he had called her. (*Id.* at 62). Ms. Jones explained that she assumed he was returning home from work at that time as he had similar work schedules in the past. (*Id.*).

On February 18, 2018, at 7:06 p.m., [Appellant] [was] caught on surveillance cameras at a Burlington Coat Factory in the vicinity of Ms. White's home in Cheltenham, PA. (*Id.* at 134). The Burlington Coat Factory [L]oss Prevention Officer, Kevin Cromwell, testified that the video and the sales record indicates [Appellant] purchased a gray hooded sweatshirt, gray sweatpants, a knife[,] and a chopping board. (*Id.* at 139, 146). Mr. Cromwell testified that the knife was silver. (*Id.* at 150). The surveillance video also indicates [Appellant] was wearing tan Timberland boots while he [was] inside [of] the Burlington Coat Factory. (N.T. Trial by Jury, 3/4/19, at 102). [Appellant] exited the Burlington Coat Factory at 7:23 p.m. (N.T. Trial by Jury, 2/27/19, at 140).

[Appellant] subsequently entered a Wendy's restaurant at 7:33 p.m. (*Id.* at 167). Surveillance video obtained from the Wendy's show[s] [Appellant] wearing the same tan Timberland boots he is seen wearing in the Burlington Coat Factory surveillance video. (*Id.* at 169). [Appellant] is later seen from surveillance video traveling on a SEPTA bus towards his home and wearing the same tan Timberland boots. (N.T. Trial by Jury, 3/4/19, at 104). [Appellant] is also seen holding a Burlington Coat Factory bag. (*Id.*).

On February 19, 2018, at approximately 3:20 a.m., authorities responded to Eboney White's apartment due to a reported argument and located Ms. White deceased inside the master bedroom upon their arrival at the scene. (N.T. Trial by Jury, 2/22/19, at 67-68, 80). Officers observed the victim had sustained multiple stab wounds. (*Id.* at 96-97). Ms. White's daughters, A.G. and E.G., were present at the scene when the police arrived. (*Id.* at 75, 81). Authorities spoke with A.G. who indicated a man in a gray hooded sweatshirt and a mask had stabbed her mother. (*Id.* at 171). Authorities interviewed A.G. several hours later[,] and she again indicated a man in a gray hooded sweatshirt and a mask had stabbed her mother. A.G. also stated the assailant was wearing tan Timberland boots. (N.T. Trial by Jury, 2/27/19, at 162).

- 6 -

Later that day, a forensic interview was conducted with A.G. at a child advocacy center named Mission Kids. (N.T. Trial by Jury, 2/25/19, at 107). During the interview, A.G. stated that [at] approximately 2:00 a.m. she saw a man in the doorway of her mother's bedroom who she thought may be [Appellant]. (***Id.*** at 112-13-Commonwealth Exhibit 330-(b)). A.G. subsequently described that the individual she had observed had a similar build, stance[,] and mannerisms as [Appellant]. (***Id.***). She specifically described the build as medium and the height as 6'2". (***Id.*** at 113). A.G. stated that she had previously seen [Appellant] inside their apartment late at night. (Commonwealth Exhibit 330-(b)). A.G. indicated she subsequently went back to sleep and, around 2:45 a.m., she heard screaming emanating from her mother's bedroom. (***Id.***). Upon entering the bedroom, A.G. observed that the man she had seen earlier was stabbing her mother. (***Id.***). A.G. stated the male was wearing a gray sweat suit set, which included gray sweatpants, a gray sweatshirt, a hood, and a black mask with words. (***Id.***). A.G. also stated the man was wearing brown Timberland boots. (***Id.***). A.G. indicated that she screamed at the assailant to stop hurting her mother, and he lunged at her with a knife in his hand. (***Id.***). A.G. subsequently retreated to her bathroom where she called 911. (***Id.***).

A.G. subsequently took part in a second interview at Mission Kids on March 17, 2018. (N.T. Trial by Jury, 2/22/19, at 115). During this interview, A.G. provided more details which she had remembered, including the fact that she observed the assailant leaning against the wall in the same manner that [Appellant] would stand against the wall at the opening to the kitchen while he was watching her mother cook. (N.T. Trial by Jury, 2/22/19-Commonwealth Exhibit 331-(c)). A.G. also referenced how the assailant's body frame matched [Appellant's] build. (***Id.***).

During her testimony at trial, A.G. restated this description of the events she witnessed on the night of the murder. (***See generally*** N.T. Trial by Jury, 2/22/19, at 9-59). A.G. also indicated the knife she observed the assailant using was silver and small to medium in size. (***Id.*** at 37). A.G. further indicated that the assailant's body frame was different from her father, David Gardner's, body frame. (***Id.*** at 57). A.G. testified that she had no doubt that [Appellant] was the one she saw murdering her mom on February 18, 2018. (***Id.*** at 58).

Bryant McKay, [Jr.], an individual who knew [Appellant] from his childhood[,] testified that he was visiting his girlfriend at the [same apartment complex where Ms. Jones lived] on February

18, 2018. (N.T. Trial by Jury, 2/27/19, at 176, 179). Mr. McKay explained that at approximately 1:15 a.m. he went to the "C" building laundry room to put his clothes in the dryer. (*Id.* at 181). Mr. McKay recalled that no one else was present in the laundry room at that time. (*Id.*). Mr. McKay stated that he returned to the laundry room at 4:40 a.m. to retrieve his clothes from the dryer. (*Id.* at 182, 188). When Mr. McKay entered the laundry room, he observed [Appellant] bent over the sink with the water running. (*Id.* at 182). Mr. McKay described [Appellant] as "aggressively cleaning himself." (*Id.* at 183). Mr. McKay asked [Appellant] if he was alright and [Appellant] replied "yea, yea, yea, I'm cool, I'm cool," but continued to aggressively wash himself at the sink. (*Id.* at 184). [Appellant] had his shirt up and was washing his body. (*Id.*).

Ernestine Scott received the news in the early morning hours on February 19, 2018, indicating her daughter had been murdered. (N.T. Trial by Jury, 2/22/19, at 240). Ms. Scott contacted [Appellant's] parents about the news and informed them that Ms. White was carrying [Appellant's] child. (*Id.* at 241). [Appellant's] parents did not seem to know about the pregnancy at this time. (*Id.*). Ms. Scott asked [Appellant's] parents to have [Appellant] call her. (*Id.* at 244). [Appellant] eventually called Ms. Scott back and after she informed him of the news [Appellant] immediately blamed David Gardner, the father of Ms. White's children. (*Id.* at 244-45). Ms. Scott also informed [Appellant] that he needed to call the police. (*Id.* at 245).

[Appellant] reached out to authorities at 8:43 a.m. on February 19, 2018, and subsequently met with them. (N.T. Trial by Jury, 3/4/19, at 63). During the meeting, [Appellant] accompanied authorities to his home and provided them with clothes he claimed to have been wearing on February 18, 2018. (*Id.* at 64). This clothing included a pair of black Timberland boots, a pair of jeans, a maroon t-shirt, and a gray thermal shirt. (*Id.*). During the course of this meeting, authorities received screen shots from the Wendy's surveillance footage for February 18, 2018, and observed that the clothing [Appellant] had provided did not match the clothing depicted in the footage. (*Id.* at 67). Authorities subsequently accompanied [Appellant] back to his apartment, but he was unable to provide the clothes he was wearing in the Wendy's footage. (*Id.* at 67-68). [Appellant] instead provided a pair of pink sneakers. (*Id.* at 68). When authorities later obtained a search warrant for [Appellant's] apartment, they were unable to find any of the clothing

[Appellant] was wearing in the Wendy's video. (*Id.* at 72). Authorities did, however, find an empty box for tan Timberland boots. (*Id.*).

Authorities documented [Appellant's] height and weight during their meeting and noted that he was around 6'2" or 6'3" and weighed about 220 lbs. (*Id.* at 80). Authorities also observed that [Appellant] had fresh cuts on his right and middle ring fingers. (*Id.* at 82). A glue like substance appeared to have been used to seal these wounds and there was some magic marker coloring on the wounds and on [Appellant's] hands. (*Id.* at 82-83). During this meeting, [Appellant] also provided the numbers for two (2) cellular phones he possessed and provided written consent to authorities to download the contents of these phones. (*Id.* at 90).

Upon receiving and viewing the surveillance footage from Burlington Coat Factory, authorities procured a search warrant to search for the items [Appellant] had purchased but were unable to find any of these items. (*Id.* at 97). Authorities had previously executed a search warrant for a gray sweatshirt and sweatpants and were unable to find these items. (*Id.* at 96-97). During the entire course of their investigation, authorities were unable to find any of the items [Appellant] was wearing in the Wendy's video or the items he purchased in the Burlington Coat Factory video. (*Id.* at 105, 115-16).

Jennifer Jones testified that [Appellant] owned a pair of tan Timberland boots. (N.T. Trial by Jury, 2/27/19, at 65). Ms. Jones further testified that she had never seen the gray sweatshirt, knife, and cutting board [Appellant] had purchased from Burlington Coat Factory on February 18, 2018. (*Id.* at 84-87). Ms. Jones indicated that when she was with [Appellant] on February 17 and 18, 2018, she did not notice any cuts on his hands. (*Id.* at 65-66). Ms. Jones noted that this was something she would have noticed since she is "very observant." (*Id.* at 66). [Appellant's] friend, Aaron Mitchum, also indicated that during his time with [Appellant] at the bar on February 17, 2018, he did not notice any cuts on [Appellant's] hands. (*Id.* at 121).

Detective William Mitchell, an expert in cell details records, cell site tower mapping, and forensic cell phone analysis conducted a cell site analysis of the two phones [Appellant] provided to authorities. (N.T. Trial by Jury, 2/26/19, at 32). Detective Mitchell found that one of [Appellant's] cell phones was accessing cell sites in the vicinity of the Wendy's restaurant and the Burlington Coat Factory on February 18, 2018, at 6:55 p.m.

(*Id.* at 39-40). The phone remains in that vicinity until 8:05 p.m., at which time the phone accessed sites in the vicinity of [Appellant's] residence. (*Id.* at 41). This cell phone remained using the site in this area until there is a gap in usage from 12:39 a.m. until 3:23 a.m. (*Id.* at 41-42). At 3:23 and 3:25 a.m., this cell phone sent two (2) outgoing text messages to Ms. White's cell phone stating respectively: "Just woke back up. You up?" and then "Just thinking. I really hope all this ends well. I don't want this to affect the kids negatively." (*Id.* at 59). The phone accessed a cell site in the vicinity of [Appellant's] residence when sending these messages. (*Id.* at 42-43). There is another period of inactivity until 5:43 a.m. when this phone again sends text messages to Ms. White's phone. (*Id.* at 43). The phone is again using cell tower sites in the vicinity of [Appellant's] residence at this time. (*Id.*). Detective Mitchell presented a video demonstration in which he illustrated how [Appellant's] cell phone had the capability of prescheduling text messages to be sent at a designated time in the future. (*Id.* at 45).

In the event [Appellant] did not preschedule these text messages, authorities measured the distance between [Appellant's] apartment and Ms. White's apartment to be 1.85 miles. Authorities performed an experimental walk along this route at a "comfortable pace" on a Sunday night around 3:00 a.m. and found it took approximately thirty-five (35) minutes. (*Id.* at 109). Authorities also experimented with driving the most direct route between the two residences on a Sunday night [at] around 3:00 a.m. and found that while driving at a normal pace it took approximately six (6) minutes. (*Id.*). Therefore, assuming the murder took place [at] approximately 2:45 a.m. and [Appellant] fled shortly afterwards, he would have had ample time to get back to his residence and send these two text messages regardless of his mode of travel.

Forensic Pathologist Khalil Wardak of the Montgomery County Coroner's Office testified that Ms. White died from multiple stab wounds and [the] cause of death for the unborn child was intrauterine death due to maternal stab wounds. (N.T. Trial by Jury, 2/28/19, at 205-06). Dr. Wardak indicated that Ms. White had defensive wounds which were consistent with an attempt to block her attacker. (*Id.* at 211-12). Dr. Wardak testified that one of Ms. White's neck wounds was so deep it did not allow her brain to receive oxygenated blood or return deoxygenated blood. (*Id.* at 217). This wound cut through bone and artery. (*Id.* at 218).

Dr. Wardak indicated this wound would have caused death within one minute. (*Id.* at 218).

\*\*\*

Dr. Wardak further testified that he examined the knife, which authorities had purchased at the Burlington Coat Factory [and which was an exact replica of the knife purchased by Appellant]. [T]his knife was consistent with the stab wounds Ms. White had sustained. (*Id.* at 19). Dr. Wardak also indicated that slip injuries occur when an aggressor's hand slips and cuts itself on the knife. (*Id.* at 26). This hand slippage can occur when there is an abundance of blood, such as in the instant matter, which causes the knife to become slippery. (*Id.*). This slippage can also occur where the aggressor stabs into bone, such as in the instant matter, thereby causing the hand to slip and cut itself. (*Id.*). Dr. Wardak concluded that [Appellant's] hand injuries were consistent with slip injuries and also consistent with an individual who would be utilizing a knife similar to the one [Appellant] purchased from Burlington Coat Factory. (*Id.* at 28).

With respect to David Gardner, the father of Ms. White's children, A.G. and E.G., he acknowledged during [his] testimony that he had been physically abusive in the past to Ms. White in part due to his alcoholism. (N.T. Trial by Jury, 2/25/19, at 206). Following one of these incidents in 2017, Mr. Gardner moved to South Carolina. (*Id.* at 206-07). Mr. Gardner also acknowledged that he had a verbal confrontation with Ms. White in November 2017 when he traveled to Pennsylvania for a child support hearing. (*Id.* at 207-10). Mr. Gardner insisted this confrontation never became physical. (*Id.* at 210). Mr. Gardner subsequently made the decision to move back to Pennsylvania in 2018 to be closer to his mother and daughters. (*Id.* at 211).

Mr. Gardner lived with his mother, Veonda Gardner, in the Mount Airy section of Philadelphia when he moved back to Pennsylvania. (*Id.* at 216). On February 18, 2018, Mr. Gardner spent the morning at his friend, Angela Yanni's, house. (*Id.* at 212). Following his departure from Ms. Yanni's home, Mr. Gardner took the bus to his mother's house and arrived at approximately 2:30 p.m. (*Id.* at 216, 256). Mr. Gardner stayed at this home the rest of the evening due to a job interview he had the next morning. (*Id.*). During this time period, he had dinner with his mother and her fiancé and went upstairs to his room at approximately 8:00 p.m. to watch television and go to sleep. (*Id.* at 217). Mr. Gardner's mother and her fiancé were still in the downstairs

- 11 -

portion of the house when he went to sleep. (*Id.*). Mr. Gardner was awoken later in the night by phone calls to his cell phone from his father and his uncle indicating Ms. White had been murdered. (*Id.* at 220-22). Mr. Gardner subsequently received a ride from his mother to the crime scene and gave a statement to the police. (*Id.* at 224, 226). Authorities asked Mr. Gardner if they could have his cell phone number and look at his cell phone, and he obliged. (*Id.* at 227). Mr. Gardner also provided the clothing he was wearing the night before in response to a police request. (*Id.*). Mr. Gardner also allowed authorities to search his room and take pictures of his face and body. (*Id.* at 227-28). As the investigation into the murder progressed, Mr. Gardner, who had moved to Florida in the meantime, flew up to Montgomery County multiple times of his own free will to speak with investigators. (*Id.* at 239).

Veonda Gardner testified and confirmed that Mr. Gardner was with Ms. Yanni in the morning and early afternoon of February 18, 2018, and [he] returned home at 2:30 p.m. (*Id.* at 150). Ms. Gardner also indicated Mr. Gardner had dinner with her at her home that night and went upstairs to bed at approximately 8:00 p.m. (*Id.* at 150-51). Ms. Gardner stated her home is equipped with an alarm system which has motion detectors covering the downstairs area and, when armed, will begin beeping loudly in the event anyone begins walking around. (*Id.* at 152-53). The alarm also covered the exterior of the house and ingress/egress areas such as the door. (*Id.* at 152). On the night of February 18, 2018, Ms. Gardner set the alarm at approximately 9:30 p.m. or 10:00 p.m. and went upstairs. (*Id.* at 153). Around 1:15 a.m., Ms. Gardner looked into her son's room and saw that he was sleeping. (*Id.* at 154). Following her activation of the alarm, Ms. Gardner did not hear any beeps indicating someone was walking around downstairs. (*Id.* at 156). Ms. Gardner further indicated that no beeps from the alarm had awoken her during the night and had the alarm beeped she would have easily been awoken due to the volume of the system. (*Id.* at 173).

Jerry Scott, Veonda Gardner's fiancé, also confirmed that when he went to bed at approximately midnight, Mr. Gardner was still inside his room. (*Id.* at 181). Mr. Scott testified that when he woke up at 4:20 a.m., he walked by Mr. Gardner's room and observed that he was inside sleeping. (*Id.* at 185). Mr. Scott indicated that he had to turn off the alarm when he went downstairs that morning, which confirms it had been activated the previous evening. (*Id.* at 188). Mr. Scott confirmed that he had

not heard any beeping from the system overnight and the beeping sound, which is triggered by motion in the downstairs area, would have typically woken him up. (*Id.*). Mr. Scott also testified that the alarm will be triggered when the door is ajar. (*Id.* at 177). In the event the alarm was triggered, the security company would call, but they did not receive any calls that day. (*Id.* at 198).

Detective Todd Richard of the Montgomery County Detective Bureau confirmed that Mr. Gardner provided his phone number [and] clothing, and he allowed authorities to take pictures of his body and search his room. (N.T. Trial by Jury, 3/4/19, at 56-58). Detective Richard indicated that he did not observe any fresh injuries on Mr. Gardner's hands when he spoke with him on February 19, 2018. (*Id.* at 59). Detective Richard also spoke with Ms. Yanni, Mr. Gardner's mother, and her fiancé, and had the opportunity to examine the cell site data for Mr. Gardner's phone showing the locations of his phone on February 18 and 19, 2018. (*Id.* at 61). The detective testified that the information Mr. Gardner had provided regarding his whereabouts was "perfectly consistent" with his conversations with these individuals and his examination of the cell site data. (*Id.* at 62). Detective Richard also confirmed that Mr. Gardner's mother did indeed have an alarm system in her home. (*Id.*).

When viewed in a light most favorable to the Commonwealth, as the verdict winner, the evidence was sufficient to establish [Appellant] was the assailant who murdered Eboney White [and her unborn child].

Trial Court Opinion, filed 2/3/20, at 34 -44 (footnote and bold omitted).

We agree with the trial court's analysis in this regard, and applying the requisite standard of review, we conclude the evidence was sufficient to establish Appellant was the person who stabbed Ms. White. *See Brooks*, *supra*.

We specifically reject Appellant's contention that "the Commonwealth relied on tenuous inferences and speculation[.]" Appellant's Brief at 25. A.G. witnessed her pregnant mother's murder. Her statements to authorities, as

well as her in-court testimony identifying Appellant as her mother's attacker, and the extensive circumstantial evidence, sufficiently proved that Appellant was the perpetrator of the crimes. *See Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991) (indicating circumstantial evidence alone may be sufficient to sustain a conviction so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt).

Appellant next contends the jury's verdict is against the weight of the evidence. Specifically, Appellant avers A.G.'s identification of him as the attacker is unreliable, particularly when weighed against the evidence suggesting A.G.'s father, David Gardner, was the attacker, thus rendering the jury's verdict against the weight of the evidence.[3]

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. *Talbert*, *supra*.

---

[3] Appellant adequately preserved his weight claim in the lower court. *See* Pa.R.Crim.P. 607.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence.  ***See id.***

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.  One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Id.*** at 546 (quotation omitted).  Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." ***Id.*** (quotation marks and quotation omitted).

Here, in rejecting Appellant's weight of the evidence claim, the trial court relevantly indicated the following:

> To the extent [Appellant] claims the identification testimony presented by A.G. was weak, tenuous, vague, and tainted, this claim is belied by the record.  A.G. consistently stated, during every Mission Kids interview, police interview, and trial testimony, that the individual who was stabbing her mother was wearing a gray hooded sweatshirt, gray sweatpants, and tan Timberland boots.  These are the same items [Appellant] was either wearing or purchased [at the Burlington Coat Factory] on the night of the murder.  A.G. noted that the build of the assailant was similar to [Appellant] and that he leaned against the wall in the same manner as [Appellant].  A.G. also noted that this was not similar to David Gardner's build….A.G.'s growing confidence that [Appellant] was the individual who committed these acts was due to her having time to reflect and collect her thoughts rather than

any undue influence placed upon her by authorities or family members. The jury found her testimony to be credible[.]

To the extent [Appellant] contends the weight of the evidence demonstrates David Gardner was the assailant, this claim is also belied by the record. Mr. Gardner cooperated with the police at every opportunity and did not have any type of ultimatum hanging over him such as [Appellant]. Credible evidence demonstrated Mr. Gardner was in his room at his mother's home at the time the murder occurred. Everything Mr. Gardner told detectives was able to be verified, unlike the materials [Appellant] provided to authorities.

Therefore, the verdict was not so contrary to the weight of the evidence such that it shock one's sense of justice.

Trial Court Opinion, filed 2/3/2020 at 46 (citation omitted).

We conclude the trial court did not abuse its discretion in denying Appellant's challenge to the weight of the evidence. *Talbert*, *supra*. We note the jury was free to determine the weight to be given to A.G.'s testimony, as well as reject Appellant's theory that David Gardner was the perpetrator. To the extent Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, we decline to do so as it is a task that is beyond our scope of review. *See Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact"). Accordingly, we find no merit to Appellant's weight of the evidence claim.

In his final claim, Appellant contends the trial court erred in admitting A.G.'s out-of-court statements, including the written statements A.G. made in her diary, the oral statements A.G. made to the child forensic interview specialist at Mission Kids, and the oral statements A.G. made to her

grandmother (Ernestine Scott). Appellant contends A.G.'s out-of-court statements were inadmissible hearsay not subject to an exception, and therefore, the trial court erred in admitting the statements.

Initially, we note:

> The standard of review employed when faced with a challenge to the trial court's decision as to whether or not to admit evidence is well settled. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

**Commonwealth v. Young**, 989 A.2d 920, 924 (Pa.Super. 2010) (citations omitted).

"Generally, an out-of-court statement is inadmissible at trial unless it falls into one of the exceptions to the hearsay rule." **Commonwealth v. Hunzer**, 868 A.2d 498, 510 (Pa.Super. 2005). **See also** Pa.R.E. 801(c)(1) (defining "hearsay" as statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement"), 803 ("Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute.").

In the case *sub judice*, the trial court determined that A.G.'s out-of-court statements were admissible under the Tender Years Hearsay Act.[4]

Pennsylvania's Tender Years Hearsay statute relevantly provides the following:

**§5985.1. Admissibility of certain statements**

**(a) General rule.--**

(1) An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated..., not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(i) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient *indicia* of reliability; and

(ii) the child either:

(A) testifies at the proceeding; or

(B) is unavailable as a witness.

42 Pa.C.S.A. § 5985.1(1)(i)-(ii)(A)-(B) (bold in original).

Here, there is no dispute that A.G. was twelve years old when she made the challenged out-of-court statements, Appellant's charged crimes were enumerated under the Tender Years statute, A.G. testified at trial, and A.G.'s statements were relevant. **See** 42 Pa.C.S.A. § 5985.1. Rather, Appellant contends the trial court erred in concluding "that the time, content and

_____

[4] We note the Commonwealth filed a pre-trial petition seeking to admit A.G.'s out-of-court statements under the Tender Years Hearsay Act, and following a hearing, the trial court granted the petition.

circumstances of the statement[s] provide sufficient *indicia* of reliability[.]"

42 Pa.C.S.A. § 5985.1(a)(1)(i).

Our Supreme Court has relevantly held:

> The "admissibility of this type of hearsay is determined by assessing the particularized guarantees of trustworthiness surrounding the circumstances under which the statements were uttered to the person who is testifying. To determine whether a child's out-of-court statements are admissible under the [Tender Years Hearsay Act],
>
> > a trial court must assess the relevancy of the statements and their reliability in accordance with the test enunciated in ***Idaho v. Wright***.[5] Although the test is not exclusive, the most obvious factors to be considered include the spontaneity of the statements, consistency in repetition, the mental state of the declarant, use of terms unexpected in children of that age and the lack of a motive to fabricate.

***Commonwealth v. Walter***, 625 Pa. 522, 93 A.3d 442, 451 (2014) (quotation

marks and quotation omitted) (footnote added).

Here, in determining there was sufficient *indicia* of reliability to permit

the admittance of A.G.'s out-of-court statements, which indicated Appellant

was the person who killed Ms. White,[6] the trial court relevantly stated the

following:

---

[5] ***Idaho v. Wright***, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

[6] Regarding A.G.'s out-of-court statements, which she made in her diary and to the forensic examiner at Mission Kids, Appellant avers generally that A.G.'s statements regarding the build and mannerisms of her mother's attacker had insufficient *indicia* of reliability. Regarding A.G.'s out-of-court statements, which she made to her grandmother, Appellant contends A.G.'s specific

[T]he court held a hearing on the Tender Years exception. During the hearing, testimony revealed that A.G., the victim's twelve-year-old daughter, made a 911 call to police on February 19, 2018, to report a stabbing at her apartment on Maher Way in Elkins Park. (N.T. Hearing on Tender Years, 2/14/19, at 14). When police arrived at the scene at approximately 3:20 a.m., they located A.G. hiding in the bathroom of the apartment and found the [*sic*] A.G.'s mother stabbed to death inside the apartment. (*Id.* at 14). A.G. informed the police at the scene that a man wearing a gray sweatshirt and mask had stabbed her mother. (*Id.* at 21).

Later that day, at approximately 9:30 a.m., a forensic interviewer met with A.G. at a child advocacy center known as Mission Kids. (*Id.* at 35). During this interview, which was videotaped, the interviewer utilized non-leading questions to get responses from A.G. (*Id.* at 32). A.G. demonstrated that she knew the difference between the truth and a lie and demonstrated that she could remember a past event and describe it accurately. (*Id.* at 35-36). During this interview, A.G. provided a detailed recitation of what she had observed a few hours before, including a physical description of the man in the gray sweatshirt and mask. (Mission Kids Interview, 2/19/18, at 9-19, 42). A.G. stated that [at] around 2:00 a.m. she saw the man standing in the doorway of her mother's room and suspected it was [Appellant]. (*Id.* at 9). A.G. also described how the assailant was wearing brown Timberland boots. (*Id.*). A.G. also discussed how her father, David Gardner, had been abusive to her mother in the past and talked in detail about that relationship. (*Id.* at 29-31).

Following her mother's murder, A.G. moved to Texas to stay with her grandparents and began to remember more about what she had observed on the night of her mother's murder. (N.T., Hearing on Tender Years, 2/14/19, at 76). A.G. informed her grandmother about what she was remembering and she advised A.G. to keep a journal and write down anything else which came to mind about what she had observed. (*Id.*).

On March 17, 2018, A.G. participated in a follow-up interview at Mission Kids. (*Id.* at 37). The interviewer again presented competency questions to A.G., including whether she

statement to her grandmother indicating Appellant committed the murder had insufficient *indicia* of reliability. Appellant's Brief at 22-23.

knew the difference between the truth and a lie. (*Id.* at 38). The interviewer confirmed in testimony that A.G. appeared to be "just as bright and articulate as the first time [the interviewer] spoke with her." (*Id.*). Prior to the interview, the forensic interviewer had been provided with entries from A.G.'s journal. (*Id.* at 39). During the interview, A.G. indicated she learned [Appellant] had been identified as a person of interest. (*Id.* at 40). A.G. stated she learned this information from her grandmother, who had learned from the police. (Mission Kids Interview, 3/17/18, at 17).

A.G. told the interviewer that she wanted to participate in a follow-up interview because her head was "a little more clear" and she was remembering some additional things from the last time she spoke with the interviewer. (*Id.* at 3). Specifically, A.G. was remembering some context clues which made her think [Appellant] could have been the perpetrator. (*Id.*). A.G. remembered how [Appellant] would lean up against the wall at the opening to the kitchen while he was watching her mother cook. (*Id.* at 3-4). A.G. stated that the way the assailant was standing in the hallway on the night of the murder reminded her of the exact way [Appellant] would stand against the wall. (*Id.* at 4). A.G. also provided details regarding the night of the murder, which were consistent with the description she had previously provided during the February 19 interview. (*See generally id.* at 9-15).

During the interview, A.G. never identified [Appellant] as the individual who committed the murder. (N.T. Hearing on Tender Years, 2/14/19, at 40). The interviewer testified that it never appeared to her that A.G. was representing anything but her own beliefs or memories. (*Id.*). The interviewer further testified that she never had any sort of impression that A.G.'s statements came from someone other than herself. (*Id.* at 41).

The majority of A.G.'s statements in the Mission Kids interview and the statements she made to her grandmother about her additional memories were admissible under the Tender Years Act….The content and circumstances of A.G.'s statements…provide sufficient *indicia* of reliability. A.G. made her statements close in time to the event, she had a clear and coherent mental state and provided ample detail regarding the incident, which contains a particularized degree of trustworthiness. *See Walter*, *supra*. A.G. had no apparent or obvious motive to fabricate. *See id.* A.G. was also very articulate and was able to describe the incident without any prompting or suggestive questioning. A.G. consistently described what

- 21 -

occurred on the night of the murder and the fact that she remembered additional details following the first interview was simply the result of A.G. synthesizing context clues in the following weeks once she had a chance to calm down[.] Lastly, A.G. testified at the Tender Years Act hearing and at trial, and [she] was available for cross-examination. Therefore, A.G.'s out of court statements…were admissible under the Tender Years Exception to the rule against hearsay.

Trial Court Opinion, filed 2/3/2020, at 14-17.

We find no abuse of discretion in this regard. ***See Young***, ***supra***. Specifically, the trial court properly examined the trustworthiness of A.G.'s out-of-court statements. In so doing, the trial court considered the spontaneity of A.G.'s statements, her consistency in making her statements, her mental state, and her lack of a motive to fabricate. ***See Walter***, ***supra***. Further, there is no indication A.G. used terms unexpected of a child her age. ***See id.***

Simply put, the trial court did not abuse its discretion in concluding the time, content, and circumstances of A.G.'s statements provide sufficient *indicia* of reliability so that the statements were admissible under the Tender Years Hearsay Act.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2020