J-A25010-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JALIEL RODRIGUEZ | : | |
| | : | |
| Appellant | : | No. 178 MDA 2020 |

Appeal from the Judgment of Sentence Entered November 13, 2019
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0006629-2017

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY BOWES, J.:                **FILED MARCH 04, 2021**

Jaliel Rodriguez appeals from his November 13, 2019 judgment of sentence of life imprisonment without parole, which was imposed following his convictions for second–degree murder, robbery, and person not to possess a firearm.  He challenges the sufficiency and weight of the evidence supporting his murder and robbery convictions.  After thorough review, we affirm.

We glean the following facts from the evidence introduced at a jury trial commencing September 10, 2019.  On September 25, 2017, at approximately 11:00 p.m., Jasmine Holmes and Patrice Allen were watching Netflix in their home at 621 Dauphin Street, Harrisburg, Pennsylvania.  N.T., 9/10/19, at 83.  They heard a thud at the door.  *Id*. at 85.  Jasmine quickly realized someone was trying to kick in her door.  She ran to the door and threw her body against it to prevent the intruder from breaking in.  *Id*. at 88.  Patrice picked up a gun that was on the sofa between them and moved toward the door, attempting

at the same time to remove the safety on the gun. *Id*. at 92. Jasmine heard a pop, which she recognized as a gunshot. *Id*. She looked behind her and saw Patrice clutching her stomach and falling to the ground. *Id*. A bullet had pierced the door and struck Patrice in the abdomen. Jasmine immediately called 911, and when the ambulance arrived, Patrice was able to walk out. However, she was pronounced dead at 9:00 a.m. the next morning due to internal bleeding caused by the gunshot wound. N.T., 9/11/19, at 293. A .40 caliber projectile was recovered from the victim's body and turned over to police. *Id*.

At the scene that night, Forensic Investigator Duane Pyles collected one .40 caliber casing manufactured by Winchester. N.T., 9/10/19, at 45. He also took photographs depicting the bullet hole in the front door, and which established that the projectile was fired into the home from outside. *Id*. at 51. Other photographs captured drugs, drug paraphernalia, guns, and small denominations of money within the home. At trial, Ms. Holmes admitted that she sold drugs out of the home on Dauphin Street and that her home had previously been burglarized.

Several neighbors heard the gunshot on September 25, 2017. One neighbor, Amber Neely, saw a light-skinned black male wearing black pants, a red shirt, and black hoodie running up the street shortly after she heard the gunshot, and she observed further that there were no cars on the street at the time. *Id*. at 131, 135-137.

At or about noon the next day, September 26, 2017, Dauphin County Sheriff's Deputy Josh Long spotted a vehicle that he recognized as being associated with Appellant near 7th and Maclay Streets. *Id*. at 143. Appellant was wanted on an outstanding warrant. When the deputy saw Appellant sitting in the front passenger seat of the car, he radioed another unit, which effected the traffic stop. *Id*. at 144-145. As Deputy Pyles observed the stopped vehicle, he noticed that Appellant was making a lot of distinctive movements in the car. *Id*. at 145. He and the other deputies approached the vehicle with guns drawn. *Id*. at 146. When Appellant refused their commands to step out of the vehicle, they removed him. *Id*. at 150. The officers located a pistol in the glovebox, identified as a loaded black Beretta handgun, together with a magazine. *Id*. Another magazine was located in Appellant's pocket. Further search of the vehicle yielded bundles of suspected heroin. Appellant volunteered to law enforcement that everything in the car was his. *Id*. at 147. He later reiterated that statement to Agent Chris Burnell, associated with the Attorney General's office, after the agent gave him his *Miranda* warnings and he waived his rights in writing. *Id*. at 155-56.

Agent Burnell testified at trial that they had set up Appellant on September 19, 2017, for an arrest based on the outstanding felony warrant. *Id*. at 159. At that time, Appellant fled police in a vehicle, drove through a neighborhood, abandoned the vehicle, and ran on foot. *Id*. at 158. Agent Burnell retrieved suspected heroin, but did not recover a firearm. Police

officers from Lower Swatera later located a firearm in a yard that was in Appellant's flight path, which was identified as a Glock .40 caliber with an extended clip. *Id*. The possession of this weapon was the basis of the person not to possess charge against Appellant.

Quames Foster testified at trial and recounted the following. He is a part-time cab driver who knew Appellant. Sometime between September 19 and September 25, 2017, Appellant was in Foster's cab. Appellant told Foster that he was forced to discard money and a gun. *Id*. at 167. Appellant confirmed that it was the weapon Foster had seen before, a Glock .40 caliber with an extended magazine. *Id*. On this date, Appellant had a different gun on the seat beside him in the cab, a black Beretta. *Id*. at 169. Foster identified the Beretta, marked as Commonwealth Exhibit 47, as the same gun Appellant had in his possession on and after September 19, 2017. *Id*.

Around midnight on September 25, 2017, Foster received a call for a ride from Appellant. Appellant asked Foster to pick him up at 15th and State Streets, and he was there when Foster arrived about ten to fifteen minutes later. *Id*. at 173-73. Foster described Appellant as "visibly shaken" and "paranoid." *Id*. at 174. Appellant instructed him to be very cautious and not to draw any attention to the vehicle. *Id*. at 176. They saw a police car on State Street, and Appellant "ducked down" to avoid being seen. *Id*. at 177. Appellant told Foster he had been "shaking something down," a term Foster understood to mean a robbery or a theft. *Id*. at 172.

Foster transported Appellant to Steelton that night and retrieved him again the next morning. Aware that Appellant had friends or relatives on the portion of Dauphin Street between 6th and 7th Streets, Foster told Appellant that there was a lot of police activity at that location and suggested that he should check on his people. *Id*. at 182. Appellant responded that everyone was okay. *Id*.

Later that day, shortly after noon, Foster was taking his mother to the store. He saw officers stop a blue vehicle at the light at 7th and Maclay, and pull Appellant from the vehicle. *Id*. at 185.

On the afternoon of September 26, 2017, Detective Iachini received an anonymous tip that Appellant was involved in the Dauphin Street murder.[1] Sergeant Kyle Gautsch heard about the tip, and he checked Appellant's name in the system. He reached out to booking and learned that Appellant had been arrested by agents of the Attorney General's office for offenses involving guns and drugs. N.T., 9/11/19, at 210. Sergeant Gautsch contacted those agents and requested details about the gun that was seized from Appellant. *Id*. at 211. The agents informed him that the weapon confiscated from Appellant was a .40 caliber Beretta, which was consistent with the .40 caliber

---

[1] The anonymous tipster was subsequently identified as Quames Foster. Foster later gave a statement to police in which he detailed his interactions with Appellant in the days leading up to the murder, the night of the murder, and the next day.

casing Officer Pyles retrieved at the murder scene. The ammunition in the Beretta, like the casing, was manufactured by Winchester.

Upon learning that the gun was a black Beretta, Sergeant Gautsch arranged for forensic investigator William Kimmick III to collect and transport the firearm and magazines from the Attorney General's office, the .40 caliber cartridge found at the scene, and the bullet recovered from the victim's body, to the Pennsylvania State Police Firearms Laboratory. *Id*. at 214. Sergeant David Krumbine, who had twenty-five years of experience in the examination and identification of firearms, determined that the bullet, as well as the cartridge casing found near the door of the murder scene, were both discharged from the black Beretta seized from Appellant. Thus, the Commonwealth offered evidence that the Beretta that fired the shot that killed Patrice Allen was in Appellant's possession shortly after the murder. *Id*. at 214.

In addition, Jasmine Holmes testified that she recognized Appellant as a friend of Kyle Brown, who lives across the street from her. Mr. Brown had been in her home and purchased drugs for personal use from her. She testified that she had seen Appellant in the neighborhood on at least ten occasions, and that he had looked in her direction when she was conducting hand-to-hand drug transactions, leading her to believe that he knew she dealt drugs.

After hearing two days of the foregoing testimony, the jury found Appellant guilty of all charges. He was sentenced on November 13, 2019, to a mandatory term of life imprisonment without possibility of parole. On November 21, 2019, counsel for Appellant filed a post-sentence motion, which the trial court denied on January 14, 2020. Appellant filed a timely notice of appeal, and both the trial court and Appellant complied with Pa.R.A.P. 1925.

Appellant presents two issues for our review, which we have reordered:[2]

I. Whether the Commonwealth failed to present sufficient evidence to sustain Appellant's convictions where the Commonwealth did not prove that Appellant attempted to commit a robbery or was the person outside of 621 Dauphin Street, nor that Appellant was a principle or accomplice to a murder in the commission of a felony?

II. Whether the trial court erred in denying Appellant's Post-Sentence Motion where the verdict was against the weight of the evidence so as to shock one's sense of justice where the Commonwealth never showed, *inter alia*, that Appellant attempted to commit a robbery or was the person outside 621 Dauphin Street, nor that Appellant was a principle or accomplice to a murder in the commission of a felony?

Appellant's brief at 5.

Our standard of review when considering a challenge to the sufficiency of the evidence is well settled. Such a claim is a question of law.

We must determine whether the evidence is sufficient to prove every element of the crime beyond a reasonable doubt. We must view evidence in the light most favorable to the Commonwealth as the verdict winner, and accept as true all evidence and all

---

[2] We address Appellant's sufficiency claim first because if he were to be successful on that claim, he would be entitled to discharge on the second-degree murder and robbery convictions. *See Commonwealth v. Stokes*, 38 A.3d 846, 853 (Pa.Super. 2011).

reasonable inferences therefrom upon which, if believed, the fact finder properly could have based its verdict.

Our Supreme Court has instructed: The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

In addition, the Commonwealth may sustain its burden by means of wholly circumstantial evidence, and we must evaluate the entire trial record and consider all evidence received against the defendant.

*Commonwealth v. Green*, 203 A.3d 250, 252-253 (Pa.Super. 2019) (*en banc*) (quoting *Commonwealth v. Orie*, 88 A.3d 983, 1013-14 (Pa.Super. 2014)) (cleaned up).

Appellant challenges the sufficiency of the evidence supporting his convictions of second-degree murder and robbery.[3]  A criminal homicide constitutes second-degree murder, or "felony murder," if "it is committed while [the] defendant was engaged as a principal or an accomplice in the perpetration of a felony."  18 Pa.C.S. § 2502(b).  Robbery is one of the enumerated felonies for purposes of the statute.  *See* 18 Pa.C.S. § 2502(d).

---

[3] Appellant was also convicted of person not to possess a firearm, which stemmed from his discard of the Glock .40 caliber handgun with the extended magazine on September 19, 2017.  He does not challenge the sufficiency of the evidence supporting that conviction.

As our High Court explained in **Commonwealth v. Tarver**, 426 A.2d 569, 573 (Pa. 1981), the *mens rea* element of second-degree murder, the malice, is constructively inferred from the malice incident to the perpetration of the initial felony. **Id**. (quoting **Commonwealth v. Yuknavich**, 295 A.2d 290, 292 (Pa. 1972)).

> Robbery is defined as follows:
>
> (1) A person is guilty of robbery if, in the course of committing a theft, he:
>
> > (i)        inflicts serious bodily injury upon another;
> >
> > . . . .
>
> (2) An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission.

18 Pa.C.S. § 3701(a).

Appellant contends that the Commonwealth failed to present sufficient evidence that he caused serious bodily injury during the commission of a theft because there was no evidence that he was at or near Dauphin Street on the night of the murder, or in possession of the murder weapon at that time. Appellant's brief at 25 (citing 18 Pa.C.S. § 3701(a)(1)(i)). He claims further that Quames Foster's testimony was unreliable and that the inferences one would have to draw to convict were unreasonable. Moreover, since the Commonwealth did not prove that he committed robbery, Appellant argues he cannot be convicted of murder in the second degree as the latter requires a

criminal homicide committed while engaged in the perpetration of a felony. *Id*. at 25-26.

In support of his position, Appellant directs our attention to *Commonwealth v. Bybel*, 611 A.2d 188, 189 (Pa. 1992), wherein our Supreme Court discharged Bybel after concluding that there was insufficient evidence that he possessed the murder weapon prior to the murder. Appellant asserts that there was less evidence herein than in *Bybel* that Appellant possessed the murder weapon at the time of the robbery and shooting. In *Bybel*, evidence was introduced that the rifle identified as the murder weapon had been seized from Bybel by police seven months before, and had subsequently been released to Bybel's daughter. There was no evidence that the daughter ever gave the rifle to her father, or to anyone. All that was known was that four days after the killing, the rifle was found in Bybel's basement. The Supreme Court concluded that "[b]ecause Bybel was not shown to be in possession of the rifle between the time it was taken away from him seven months before the homicide and four days after the homicide, it cannot be said that the Commonwealth has proved beyond a reasonable doubt that Bybel was in possession of the rifle at the time of the shooting." *Id*. at 189.

Appellant argues further that the facts herein are distinguishable from the Supreme Court's decision in *Commonwealth v. Chambers*, 599 A.2d 630 (Pa. 1991), in which the Court upheld robbery and first-degree murder

convictions involving a victim who was beaten to death with a blunt instrument. Multiple witnesses testified that they saw the victim and the defendant arguing one hour before the victim's body was discovered. At that time, the defendant had what appeared to be a large stick in one of his hands, and shortly after the body was discovered, the defendant was seen carrying an axe handle.

Preliminarily, we must view the evidence in the light most favorable to the Commonwealth. Appellant's suggestion that Mr. Foster's testimony should not be credited disregards our standard of review. It is not our province to re-weigh the evidence and substitute our judgment for that of the factfinder. *Commonwealth v. Toritto*, 67 A.3d 29, 33 (Pa.Super. 2013). "[A]ny doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Id*. (quoting *Commonwealth v. Stokes*, 38 A.3d 846, 853 (Pa.Super. 2011)). This is not such a case.

The Commonwealth presented a compelling circumstantial case, anchored by evidence that Appellant was seen in possession of the murder weapon shortly before the murder, and arrested in possession of the murder weapon less than one day after, which he admitted was his weapon. Two witnesses, Jasmine Holmes and Quames Foster, provided details that, taken together, linked Appellant to the robbery and murder. Ms. Holmes established

that she was a drug dealer who conducted drug transactions on the street outside her home. She recognized Appellant as a friend of Kyle Brown who lived across the street, and she saw him on perhaps ten occasions on Dauphin Street, and that he had witnessed her conducting drug sales.

Mr. Foster's testimony established that Appellant was in possession of the murder weapon a few days before the crime occurred and the morning after. On the day of the murder, Appellant called Foster and mentioned that he was planning to "shake something down," which Foster took to mean a robbery or stealing from someone. N.T., 9/10/19, at 172. Late that evening, Appellant called and asked Foster to pick him up at 15th and State Streets, a location near the scene of the crime. Appellant was there when he arrived ten to fifteen minutes later. Foster described Appellant as "visibly shaken" and "paranoid," and afraid of drawing attention to the vehicle. *Id*. at 176. When they passed a police car on State Street, Appellant "ducked down" so that he would not be seen. *Id*. at 177.

When Mr. Foster retrieved Appellant the next morning from Steelton, Appellant had the black Beretta. *Id*. at 183. Foster reported to Appellant that there had been a lot of police activity on Dauphin Street the night before, a fact he mentioned because he knew that Appellant had family or friends at that location and that he might want to check in with them. Appellant told him that they were okay. *Id*. at 182. Foster saw Appellant early that

afternoon when he was being removed from a vehicle by police at 6th and Maclay. During that encounter, police confiscated the murder weapon.

We find that the evidence was legally sufficient to permit the jury to find beyond a reasonable doubt that Appellant committed murder in the second-degree and robbery. The evidence established that Appellant attempted to break down the door at 621 Dauphin Street to rob the occupants, and that in the course of this robbery attempt, he shot and killed Patrice Allen. Unlike the evidence herein, there was no evidence in *Bybel* linking the defendant to the murder weapon prior to the murder. The instant case is far more analogous to *Chambers*, in which the evidence revealed that the defendant was seen shortly before the murder arguing with the victim and holding a large stick, and shortly after the murder carrying a wooden axe handle. The evidence that Appellant possessed the murder weapon both before and after the shooting is sufficiently proximate in time as to permit the jury to find beyond a reasonable doubt that he committed the crimes charged. Hence, Appellant is not entitled to relief on his sufficiency claim.

We turn now to Appellant's claim that the verdict was against the weight of the evidence. When we review a weight of the evidence claim, our standard of review is distinct from the standard applied by the trial court:

> Appellate review of a weight claim **is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.** Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when

- 13 -

reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted, emphasis in original) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000)).

Appellant contends that his convictions were against the weight of the evidence because "the testimony of Jasmine Holmes and Quames Foster was unreliable, contradictory, and inconsistent with the remainder of the evidence presented at trial." Appellant's brief at 20. He alleges that many people knew Ms. Holmes was a drug dealer. Furthermore, there was no evidence of any "animosity between Kyle Brown, Jasmine Holmes, Patrice Allen, and therefore Appellant." *Id*. at 21. He suggests further that the only evidence that he possessed the murder weapon prior to September 25 was offered by Foster, whose testimony is suspect. He alleges that Mr. Foster only offered the tip to police after he observed that Appellant was stopped by police on September 26, that he received $1,000 for providing the tip, and further, that he was accorded favorable treatment in a pending drug possession charge.[4]

---

[4] We note that evidence that many people knew Ms. Holmes sold drugs, that Ms. Holmes knew Kyle Brown and his sisters, and that there was no animosity between them was placed before the jury. The jury also heard that Mr. Foster received $1,000 for his tip to police and that pending charges were disposed of in his favor. The jury was free to believe or disbelieve these individuals.

- 14 -

Moreover, no testimony placed him on Dauphin Street on the night of September 25, 2017. *Id*. at 22. Hence, Appellant claims that the verdict is against the weight of the evidence, and requests that his convictions be overturned as "the Commonwealth's evidence was so patently unreliable and/or contradictory as to make a verdict based thereon pure conjecture." *Id*. at 24.

The trial court cited the applicable law governing the weight of the evidence. It relied upon **Commonwealth v. Cruz**, 919 A.2d 279, 282 (Pa.Super. 2007), for the proposition that

> A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when 'the figure of justice totters on her pedestal,' or when 'the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience."

**See** Trial Court Opinion, 3/30/20, at 5.

Applying that test, the trial court did not find the verdict to be against the weight of the evidence. The trial court's determination was not manifestly unreasonable or the product of bias or ill-will, so we have no basis to disturb it.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/04/2021